## DELAWARE, L. & W. R. CO. v. KUTTER et al.

(Circuit Court of Appeals, Second Circuit. May 22, 1906.)

### No. 72.

1. APPEAL AND ERROR—CASE TRIED TO COURT—GENERAL FINDING—MATTERS REVIEWABLE.

When, upon a trial without a jury in a federal court, the findings of fact and of law by the court are general, exceptions to a ruling denying a motion for judgment for the defendant present for the consideration of an appellate court the question whether upon the whole evidence, with all the inferences which a jury could justifiably draw from it, the plaintiff was entitled to recover; the general finding is to be accepted as equivalent to the verdict of a jury on all matters of fact, and the appellate court cannot review the weight of the evidence.

2. JUDGMENT—MATTERS CONCLUDED—SECOND ACTION ON DIFFERENT DEMAND.

When a judgment is offered in evidence in a subsequent action between the same parties upon a different demand, it operates as an estoppel only upon the matter actually at issue and determined in the original action, and such matter, when not disclosed by the pleadings, must be shown by extrinsic evidence; but every matter necessary to the disposition of the case as made by the pleadings is included in the conclusive effect of the judgment.

[Ed. Note.—For cases in point, see vol. 30, Cent. Dig. Judgment, §§ 1248–1258.]

3. SAME.

An action to recover a sum of money alleged to be due from defendant to plaintiff under a contract, and a subsequent action for wrongful ter-

mination of the contract by defendant, although based upon the same contract, are upon different demands, and where the only defense pleaded in' the first action was a breach of the contract by plaintiff, a judgment in his favor therein is conclusive only upon that question in the second action, unless it is shown that other matters were actually litigated and decided.

[Ed. Note.—For cases in point, see vol. 30, Cent. Dig. Judgment, §§ 1248–1258.]

4. RAILROADS—CONTRACT TO SECURE TRAFFIC—VALIDITY—MONOPOLIES—CARRIERS—UNDUE PREFERENCE.

Defendant railroad company entered into a contract with plaintiff for a term of years to build up, develop, and conduct the business of the transportation of milk on its lines of road. Plaintiff was to have full charge of such business and was to receive as compensation a percentage of the freights earned therein. It was provided that he should charge rates not in excess of those charged by competitive roads, and should be granted the exclusive privilege of transporting milk over defendant's lines "so far as it was permitted to do so by law." In the execution of the contract all rates were made by defendant, and plaintiff was not given a monopoly of the milk traffic. *Held*, that such contract was not ultra vires nor void as contrary to public policy, especially as practically construed by the parties in its execution; nor was it in violation of the anti-trust act of July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200] or of section 3 of the interstate commerce act of Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3155] as giving an undue and unreasonable preference to plaintiff.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Railroads, § 434; vol. 9, Cent. Dig. Carriers, §§ 83–85; vol. 35, Cent. Dig. Monopolies, §§ 10, 12.]

5. CONTRACTS—RULES OF CONSTRUCTION—LEGALITY.

The fundamental rule is that a contract will be construed, if possible, as having been made for a legal, rather than for an illegal, purpose and it should not be relaxed when a vicious construction is sought for by the party who made the contract.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, § 734.]

In Error to the Circuit Court of the United States for the Eastern District of New York.

W. D. Guthrie and H. D. Hotchkiss, for plaintiff in error.
Augustus Vaulbyck, for defendants in error.

Before WALLACE, LACOMBE and TOWNSEND, Circuit Judges.

WALLACE, Circuit Judge. The plaintiff in error was the defendant in the court below, and by this writ of error seeks to review a judgment for the plaintiffs in an action tried by the court without a jury. The action was brought to recover damages for the breach by the railroad company of a contract dated July 9, 1886, made with Robert E. Westcott, which was to remain in force for the term of 10 years, and the duration of which was extended September 30, 1892, for the further term of 5 years.

By the terms of the contract Westcott undertook to use his best endeavors "to build up, develop, increase, facilitate, and conduct the business of transportation of milk" over the lines of the defendant's railroad; that he would be wholly responsible for the milk transported over said lines, and save the defendant harmless from all claims arising from or connected with the milk business, except those from acci-

dents and casualties to its trains or its own negligence; that he would save the defendant harmless from all liability for loss of life or injury to any person doing business over its lines on his .account; that he would not charge for transportation of milk "rates in excess of those charged by competitive railroads for similar services"; and that he should monthly pay over to the defendant 80 per cent. of all charges collected by him for the transportation of milk during the preceding month, retaining 20 per cent. thereof in full compensation for his own services.    The defendant on its part undertook to receive, load, and transport, at and from all stations on its lines, all the milk furnished at said stations for transportation, and to transport the same upon its trains at such times as might be best calculated to promote its business; that it would not permit any of its agents or servants to do any act to prevent or interfere with the developing, building up and conducting of the milk business of Westcott, and would grant him the exclusive privilege of transporting milk over its said lines "so far as it was permitted to do so by law"; that it would furnish sufficient depot accommodations for the conduct of the milk business, render such assistance to the messengers of Westcott accompanying the milk trains as might be necessary for the prompt loading and unloading of such milk, and promptly retransport and return to the several stations the empty milk cans used in the transportation of the milk.    The contract was by its terms "subject to revision after three years, and at the end of any one year thereafter on giving three months' notice," and in case of any difference between the parties, provided for a submission to arbitration.

By its answer the defendant admitted the execution of the contract and alleged as a justification for terminating it (1) that the contract was ultra vires, and contrary to public policy; (2) that it was made in violation of the acts of Congress known as the "Anti-Trust Act" and the "Interstate Commerce Act"; and (3)  that Westcott had violated the contract by entering into other contracts with competitive railroads inconsistent with his duty to the defendant and the obligations of his contract.

The plaintiffs by their reply to the answer set up as a bar to the defense alleged by the defendant the estoppel of a former adjudication in an action between the parties in the Supreme Court of the state of New York.

The trial judge did not make special findings of fact or of law, but made a general finding that the plaintiffs were entitled to recover $137,853, and interest and ordered judgment accordingly.

The evidence upon the trial was sufficient to establish the following facts:   Before the contract was made the milk traffic of the defendant was of insignificant volume.   Westcott immediately proceeded to create and develop it.   His plan of operation was to establish creameries contiguous to the lines of the defendant, and procure proprietors who would purchase the milk of the farmers in the vicinity, prepare it for market, and ship it by the defendant's lines to New York City to their own consignees.   In carrying out these operations he caused creameries to be built, costing from $1,800 to $3,000 each, at all available places along the lines of the defendant, advancing his own

money to do so when necessary, and secured purchasers or lessees of the creameries who became the proprietors, and who bought the milk of the farmers, and shipped it to New York. The freight rates to these shippers were always fixed by the defendant until 1897, when the defendant adopted the rates recommended by the Interstate Commerce Commission, but Westcott collected the freight and paid over monthly to the defendant its proportion thereof. He employed messengers who assisted in loading the milk upon the trains, cared for it en route, helped to deliver it to the consignees, and who after it was delivered returned the empty cans to the trains of the defendant to be sent back to the points from which they had been previously shipped. By Westcott's exertions and the investment of a large amount of his own money, he secured a milk traffic for the defendant which in 1899 had become very extensive.

While developing this traffic Westcott entered into similar contracts with other railroad companies having lines connecting with the defendant's lines, and built up a milk traffic on these lines which became a feeder of the defendant's traffic. After this traffic had been developed, the defendant ran its milk cars over the lines of the other companies, collected the milk at the various stations on their lines, and transported it to its own line and thence by its own line to New York, charging a through rate for all shipments, which was divided upon a mileage basis between the defendant and the other companies. The first of these contracts was between Westcott and the Delaware & Hudson Canal Co., of the date of February 19, 1891; the second was between Westcott and the Cooperstown & Charlotte Railroad Co., the road of which was a branch of the Delaware & Hudson Canal Co., of the date of June 1, 1893; the third was between Westcott and the Elmira, Cortland & Northern Railroad Co., the road of which was a branch of the Lehigh Valley Railroad Co., of the date of August 18, 1893.

During the first six years of the business the outlay and expenses of Westcott, in carrying out the contract were about $200,000, and his commissions were something less than $155,000; but by March, 1899, the contract had become very valuable to him. At that time Mr. Sloan, who had theretofore been president of the defendant, was succeeded by Mr. Truesdale. Very shortly after Truesdale became president he notified Westcott that he was dissatisfied with the contract. Several interviews took place between Truesdale and Westcott, the last being in July, 1899. In the course of these interviews Truesdale insisted that the contract was too profitable to Westcott, and his percentage must be reduced; and met Westcott's claim to the stipulated percentage by asserting in substance: "Contracts made before my coming do not stand." Truesdale also insisted that the freight should be collected directly by the defendant, and although this change of method involved a considerable loss by way of interest upon his bank account to Westcott, the latter consented. Thenceforth, the freight was collected by the defendant. During these interviews Truesdale raised no objection to the so-called competitive contracts into which Westcott had entered with other railroad companies; although all of them were known to Truesdale, having been shown to him by Westcott.

Among these contracts, besides those which have been mentioned, was one made between Westcott and the New York Central & Hudson River Railroad Co., of the date of July 1, 1896, by which Westcott undertook to develop a milk traffic for the lines of the West Shore Railroad, of which the New York Central Company was the lessee, and another was between the same parties and of the date of July 1, 1898. Both of these contracts related to territory which was not contiguous to the defendant's lines; and when they were made there were no more places along the defendant's lines where creameries could be located advantageously. The first provided by its explicit terms for a future contract such as was embodied in the second. Its terms were considered by the president of the defendant, and by the general manager and the general freight agent of the defendant. It was entered into and performed by Westcott with the sanction of President Sloan, and was not regarded by Westcott or the officers of the defendant as relating to competitive traffic. Neither contract had any practical tendency to divert traffic from the defendant, because the New York market, to which the milk was to be carried, was so extensive that the additional supply would have no appreciable effect in influencing the demand. That market absorbed a steadily increasing supply; the supply for 1901 being practically a quarter greater than in 1897. That the defendant did not lose any traffic in consequence of these contracts is plain. Until Truesdale terminated the contract with Westcott the defendant's traffic had steadily increased; afterwards it decreased. The cause of this decrease is explained by the fact that the Lehigh Valley Railroad Company and the Delaware & Hudson Canal Co., as soon as they found that Westcott was no longer in charge of the defendant's milk traffic, discontinued routing over the defendant's lines the milk traffic from the Elmira, Cortland & Northern Railroad and the Cooperstown & Charlotte Railroad, thus diverting from the defendant's line during the first year after the termination of the contract nearly a third of its entire milk traffic.

February 1, 1900, Truesdale, as president of the defendant, notified Westcott that the contract would be treated as no longer in force, assigning as the only particularized reason that Westcott had violated his contract by entering into similar contracts with other railroad companies, competitors of the defendant, with the purpose and effect of diverting the milk traffic from its railroad to the other railroads. At the same time the defendant notified shippers that it had terminated all relations with Westcott, and excluded his messengers from his cars. Thenceforth, the defendant assumed exclusive control of the milk traffic over its lines.

When the contract was terminated the defendant had in its hands the freight moneys which it had collected since July 1, 1899. Upon its refusal to pay over to Westcott his proportion of these moneys Westcott assigned his demand to one Paul. In February, 1900, Paul, as assignee of Westcott, brought an action in the Supreme Court of the state of New York to recover the amount, al-

leging as the cause of action the terminated contract, the collection of the freight by the defendant from July 1, 1899, to February 1, 1900, and the refusal of the defendant to pay over to Westcott his percentage thereof. The defendant contested the action, and set up as a defense in its answer that it was not liable to Westcott under the terminated contract because he had violated the convenant therein contained to use his best endeavors to build up, develop, increase, and conduct the business of transportation of milk over the defendant's railroad, and, in disregard of his covenant, had endeavored to and did permanently divert the milk traffic from the defendant's lines and turn the same over to other and competitive railroads. The answer further alleged that in violation of the said covenant Westcott had entered into the two contracts with the New York Central & Hudson River Railroad Co. which had been referred to. The action was brought to trial in June, 1901, and a verdict rendered therein for the plaintiff for $77,648. Thereafter judgment was duly entered in that action, and upon an appeal by the defendant to the Appellate Division of the Supreme Court of New York the judgment was affirmed.

The present action was brought after the expiration of the contract term. At the time of the trial the amount owing from the defendant for the percentage arising to Westcott under the contract, less the amount which it would have cost Westcott to perform his part of the contract, was that found by the trial judge.

Besides the facts which have been mentioned it was shown upon the trial that Westcott had made another so-called competitive contract, the existence of which does not appear to have been known to Truesdale when the latter terminated the contract. This contract was made with the Delaware & Hudson Canal Co., August 21, 1899. His earlier contract with that company, that of February 16, 1891, related to the development of the milk traffic upon and along one of the lines of the company known as the "Albany & Susquehanna Division"; and among other things it provided that at the expiration of five years the railroad company should have the right to readjust any of the terms of the contract, excepting only those fixing the percentage of revenue payable to Westcott. While this contract contemplated that the traffic developed should be carried by the company to Binghampton, where its line connected with the defendant's line, and thence by the defendant's line to New York City, it provided that the company should have the right to transport "milk and other dairy products to Albany, and ship dairy products to New York via Albany." In August, 1899, that company decided to develop a milk traffic upon other of its lines, and Mr. Young, its president, entered into negotiations with Westcott for that purpose. Westcott objected to making any new arrangement which would divert the milk traffic of the Albany & Susquehanna division from the defendant's lines at Binghampton, but Young insisted that under the existing contract his company was entitled, if it desired, to ship to New York via Albany. At the same time Young promised that until the termina-

tion of the existing contract his company would continue to carry the traffic of the Susquehanna division via Binghampton. These negotiations resulted in the new contract. Although the contract permitted the company to carry the traffic via Albany, no change was in fact made in the mode of conducting it until after the defendant terminated its contract with Westcott, but all the milk shipped on the Albany & Susquehanna division, was transported to Binghampton as before.

Upon the facts thus presented, the defendant upon the trial moved the court for a judgment in its favor upon the grounds that the defense alleged in its answer had been established, and that there was no evidence to support a judgment for the plaintiff. The assignments of error are based upon the exceptions taken by the defendant to the refusal of its motion.

When, upon a trial without a jury, the findings of fact and of law by the court are general, the exceptions to a ruling denying a motion for judgment for the defendant present for the consideration of an appellate court the question whether upon the whole evidence, with all the inferences which a jury could justifiably draw from it, the plaintiff was entitled to recover. The general finding is to be accepted as conclusive upon all matters of fact, and as equivalent to the verdict of a jury, and the Appellate Court cannot review the weight of the evidence. Lancaster v. Collins, 115 U. S. 225, 6 Sup. Ct. 33, 29 L. Ed. 373; Martinton v. Fairbanks, 112 U. S. 670, 5 Sup. Ct. 321, 28 L. Ed. 862; Lehnen v. Dickson, 148 U. S. 71, 13 Sup. Ct. 481, 37 L. Ed. 373.

In the present case a jury would have been justified in finding— and it is to be presumed in support of the general findings that the court found—that the defendant, at the instigation of its president, Truesdale, had arbitrarily and dishonorably repudiated a contract which both parties had performed for six years, which they had then extended for nine years more, which they had then performed for seven more years, and which the defendant had regarded as fair and reasonable, when Truesdale, having determined to end it because it was too profitable to Westcott, and having cast about for an excuse, assigned one which was unfounded. If Truesdale had really believed the so-called competitive contracts were really competitive, it is extremely improbable that he would not have said so in the interviews with Westcott after they had been brought to his attention, and when he was insisting that Westcott should abate his commission. However this may be, the justification assigned by Truesdale for terminating the contract was not valid if these contracts were not entered into by Westcott for the purpose of diverting the milk traffic of the defendant, and did not have any such effect. The contract between Westcott and the defendant did not obligate Westcott to give his whole time and personal services to the business of the defendant or to the business of developing its milk traffic, or not to engage in other business. If it is true, as it may be assumed the court below found, that when the two other contracts were made the milk traffic of the de-

fendant had been fully developed so far as it depended upon his efforts, and the development of a similar traffic in behalf of the New York Central & Hudson River Railroad would not, in view of the sources of supply and demand, practically interfere with the milk traffic of the defendant, there was no breach of obligation on the part of Westcott.

If it had been proved that Westcott had violated the contract by any act which tended to diminish the milk traffic of the defendant, it would be quite immaterial that Truesdale or the defendant assigned a wrong reason for terminating it, and there would have been a meritorious defense to the action.   So, also, if the contract was ultra vires, or illegal, the defendant was at liberty to repudiate it so far as it remained executory, although its conduct was despicable in adhering to the contract during the many years when it was profitable, and repudiating it only because it could make more money by doing so.

The judgment in the former suit estops the defendant from again litigating the defense that Westcott had violated the contract; but it does not estop the defendant from the benefit of the other defenses which have been interposed, because there was no evidence in the court below that these defenses were litigated in that action.   The cause of action for the money in the hands of the defendant, which it had collected as the percentage of Westcott under the contract, was for a different demand than that involved in the present action. When a judgment in an action is offered in evidence in a subsequent action between the same parties upon a different demand, it operates as an estoppel only upon the matter actually at issue and determined in the original action; and such matter, when not disclosed by the pleadings, must be shown by extrinsic evidence.   The operation of a judgment upon the demand involved in the action in which the judgment was rendered, and its operation as an estoppel in another action between the parties upon a different demand, are essentially different.   So far as the demand involved in the first action is concerned, the judgment closes all controversy; its validity is no longer open to contestation, whatever might have been alleged or proved against it at the trial. The judgment is not only conclusive as to what was actually determined respecting such demand, but as to every matter which might have been brought forward and determined respecting it. But in a subsequent action between the same parties upon a different demand, it is an estoppel only upon the matter actually controverted and determined in the former action.   The circumstance that both demands arise from the same contract is not controlling, and does not tend to establish their identity.   Davis v. Brown, 94 U. S. 423, 24 L. Ed. 204; Cromwell v. County of Sac, 94 U. S. 351, 24 L. Ed. 195; Russell v. Place, 94 U. S. 606, 24 L. Ed. 214; Perry v. Dickerson, 85 N. Y. 345, 39 Am. Rep. 663; Sparhawk v. Wills, 72 Mass. 163; Andover Savings Bank v. Adams, 83 Mass. 28.   Perry v. Dickerson is precisely in point.   There the plaintiff had brought an action to recover damages for an alleged wrongful

dismissal from the defendant's employment before the expiration of the stipulated time, and had recovered judgment therein. He brought a second action to recover wages earned during the time he was actually employed, and due and payable before the wrongful dismissal. The court held that the two claims constituted separate and independent causes of action, and that the former judgment was not a bar in the second. If the demand in the former action had been the same as in the present, it would have been merged in the former judgment and the present action for that reason could not have been maintained. The general doctrine applicable to cases like the present is stated in Russell v. Place, supra, as follows:

"It is undoubtedly settled law that a judgment of a court of competent jurisdiction, upon a question directly involved in one suit, is conclusive as to that question in another suit between the same parties. But to this operation of the judgment it must appear, either upon the face of the record or be shown by extrinsic evidence, that the precise question was raised and determined in the former suit. If there be any uncertainty on this head in the record, as for example if it appear that several distinct matters may have been litigated, upon one or more of which judgments may have passed, without indicating which of them was thus litigated, and upon which the judgment was rendered, the whole subject-matter of the action will be at large, and open to a new contention, unless this uncertainty be removed by extrinsic evidence showing the principal point involved and determined."

See De Sollar v. Hanscome, 158 U. S. 216, 15 Sup. Ct. 816, 39 L. Ed. 956.

In the present case, although the record does not specifically denote the grounds of the decision in the former action, it does disclose what issues were litigated and what must have been decided in order to result in a recovery for the plaintiff. There is included in the conclusive effect of a final adjudication every matter necessary to the disposition of the controversy as made by the pleadings; and if the determination of a question is necessarily involved in the judgment, it is immaterial whether it was actually litigated or not. Freeman on Judgments, § 272 (4th Ed.). "The estoppel extends to every material allegation or statement which, having been made on one side and denied on the other, was at issue in the cause, and was determined therein." See Aurora City v. West, 7 Wall. 103, 19 L. Ed. 42; New Orleans v. Citizens' Bank, 167 U. S. 371, 398, 17 Sup. Ct. 905, 42 L. Ed. 202.

The defendant contested the right of the plaintiff to recover on the allegations that Westcott had violated his covenant to use his best endeavors to build up and increase the milk traffic of the defendant, and had diverted that traffic to other and competitive railroads. Its answer did not allege the invalidity or illegality of the contract. The only issue presented by the pleadings was whether or not Westcott had been guilty of a breach of the contract. The adjudication against the defendant necessarily decided that he had not, as that was the only issue presented for the consideration of the court. If the validity, or the legality of the contract, was drawn in question in any manner upon the trial, the fact was not proved in the court below, and certainly cannot be inferred from the pleadings and the judgment.

Inasmuch as the former judgment concludes the defendant upon the issue tendered by its answer in that action, and estops it in the present action from asserting that Westcott violated his covenant by diverting, or endeavoring to divert, the milk traffic from the defendant to other railroad companies, or from asserting that he violated the covenant in any other way, it is unnecessary to consider whether any of the contracts made by him were theoretically competitive, or were upon any considerations violative of the contract; and it is quite immaterial whether the evidence introduced upon that issue in the trial of the former action is or is not the same as was introduced upon the trial of the present action.

If the contract was ultra vires, it was not so in the narrow sense of the term, but in the sense that its performance would involve a wrongful perversion of the powers conferred upon the corporation. An implied condition attaches to all legislative grants of corporate powers that they are conferred not merely as the privilege of the recipient to be used at its discretion, but as a quasi trust to be exercised for the benefit of the public as well. Consequently any contract of a corporation by which it disables itself from performing its duties to the public, or subordinates to its private interests the rights and conveniences which it impliedly undertakes to secure to the community, is beyond the lawful power of the corporation. Such a contract is contrary to public policy, and is invalid on that ground also. The concrete inquiry in the present case is whether the necessary tendency of the contract was to disable the defendant from performing its obligations to the public by depriving shippers of milk of some of the rights or privileges to which they were entitled at the hands of a railway carrier. If it did not have that tendency, it could not operate to restrain trade; and if it did not contravene some statutory prohibition, it was in all respects a legitimate corporate act.

The contract doubtless contemplated such a business relation and arrangement between the parties as followed its execution. Its purpose, so far as the defendant was concerned, was to enable the defendant to acquire a traffic which would have to be created, and which could not be satisfactorily built up and developed by the ordinary agencies of the defendant, and which the defendant conceived required the cooperation of Westcott. The peculiar conditions of the undertaking necessitated risks and responsibilities which the defendant was unwilling to assume, and the traffic could not be successfully developed and retained unless it was conducted with such a just regard to the interests of shippers as to be advantageous to them as well as to the defendant. In order to obtain this traffic without investing its own resources, and to carry it on with a minimum of inconvenience, expense, and risk to itself, the defendant saw fit to engage Westcott, and to put him in practically exclusive charge of the whole undertaking, upon terms and conditions which would be likely to be mutually advantageous to both parties. All this was in furtherance of its own business; and the remuneration Westcott was to receive, and the duration of the arrangement, were matters which concerned none but the parties to the agreement and which they were at liberty to settle between themselves. It

cannot be questioned that railroad companies may lawfully make all necessary arrangements for increasing their own business and for expeditiously and economically carrying it on. United States v. D. L. & W. R. R. Co. (C. C.) 40 Fed. 101; Barney v. Steamboat Co., 67 N. Y. 301, 23 Am. Rep. 115. It is certainly competent for a railroad company to employ a traffic manager, and give him exclusive charge of that branch of the business to which his duty relates, and to contract with him for a specified period of service, and pay him a commission by way of compensation. It is likewise competent for a railroad company, in the absence of any legislative prohibition, to make an agreement with the producer or shipper of a particular class of shipments, for good and sufficient reasons to carry them on any terms which the company may deem reasonable. Fitchburg R. R. Co. v. Gage, 12 Gray (Mass.) 393. As was said by the Supreme Court of Ohio in a case where the contract was to carry for a manufacturer at a fixed rate for a term of 10 years:

"We have a right to assume that the contract was to the mutual advantage of both parties, that it was made in good faith, and that its performance for the whole term would not have been injurious to the interests of the stockholders, or in any way suspend or abridge the powers conferred on the corporation to discharge the duties owed to the public as a common carrier for all on equal terms." Railroad Co. v. Furnace Co., 37 Ohio St. 321, 41 Am. Rep. 509.

The contract treats Westcott, not only as the manager of the defendant in developing and conducting its milk traffic, but also as a representative of the shippers who was entitled to have every reasonable accommodation afforded to them and to himself in aid of the defendant's covenants to facilitate the traffic. It has but two features which are open to criticism as tending to deprive shippers of some of their rights and privileges, or to favor Westcott at their expense. The provision that Westcott will charge for the transportation of milk rates not in excess of those charged by competitive railroads for similar service suggests that he is to be permitted to fix the rates subject to that restriction. If he could fix the rates solely as his own interests might dictate, it would be open to him to make rates prejudicial to the traffic or to particular shippers. But the limitation itself provides an ample protection against such an abuse of his authority, as no shipper would have just cause to complain unless his rates were in excess of the common standard for similar services. The contract does not in terms authorize Westcott to fix the rates, and may fairly be construed as intended to give him the usual authority of a manager to do so in first instance, and subject to revision by the company. The construction placed upon it by the acts of the parties themselves negatives the inference that it was intended to delegate the ultimate power to Westcott, as from the inception of the arrangement the rates were always fixed by the defendant. Where the terms of a contract are equivocal the practical construction given to it by the parties themselves is very persuasive of its real meaning. The other provision open to criticism is that which gives to Westcott the exclusive privilege of transportation. But this provision also is carefully qualified so that it may not be construed as encroaching upon the legal duty of

the defendant to other shippers. There seems to be no fair reason to infer that the qualifying terms of this provision were artfully employed to mask the purpose of the parties to give Westcott a monopoly of the milk traffic. None was actually ever given to him. It may be read as an amplification of the preceding part of the covenant by which the defendant obligates itself not to permit anything to be done on the part of its agents or servants which will interfere with Westcott's conduct of the business. The ingenuity of counsel for the plaintiff in error has been strenuously exerted in the effort to provert a contract which is capable of an innocent meaning into one which was devised to effect iniquitous ends by devious means by their own client. The fundamental rule is that a contract will be construed, if possible, as being made for a legal rather than for an illegal purpose. Hobbs v. McLean, 117 U. S. 569, 6 Sup. Ct. 870, 29 L. Ed. 940; United States v. Railroad Co., 118 U. S. 235, 6 Sup. Ct. 1038, 30 L. Ed. 173. Its application certainly should not be relaxed when a vicious construction is sought for by the party who has made the contract; and especially in a case like this where it appears that at least three other railway corporations had enterd into similar contracts. Looking at all its provisions, the contract is one which is not obnoxious to any just criticism. It is analogous in some respects to that which was before the court in Chicago, etc., R. R. Co. v. Pullman Car Co., 139 U. S. 79, 11 Sup. Ct. 490, 35 L. Ed. 97, where it was alleged that the agreement sued on was void as against public policy because of the exclusive rights given to the plaintiff for the term of 15 years in respect to drawing room and sleeping cars furnished by plaintiff to the defendant, supplemented by the stipulation that the defendant would not contract with any other party to run that class of cars over its road during the period of 15 years. The court said:

"The defendant was under a duty, arising from the public nature of its employment, to furnish for the use of passengers on its lines such accommodations as were reasonably required by the existing conditions of the passenger traffic. Its duty, as a carrier of passengers, was to make suitable provision for their comfort and safety. Instead of furnishing its own drawing room and sleeping cars, as it might have done, it employed the plaintiff, whose special business it was to provide cars of that character, to supply as many as were necessary to meet the requirements of travel. It thus used the instrumentality of another corporation in order that it might properly discharge its duty to the public. So long as the defendant's lines were supplied with the requisite number of drawing room and sleeping cars, it was a matter of indifference to the public who owned them. * * * We are of opinion that public policy did not forbid the railroad company from employing the Pullman Southern Car Company to supply drawing room and sleeping cars to be used by its passengers, and, as a means to induce the plaintiff to perform this public service and to incur the expense and hazard incident thereto, from giving it an exclusive right to furnish cars for that purpose. * * * The suggestion that the agreement is void, upon grounds of public policy, or because it is in general restraint of trade, cannot for the reasons stated, be sustained."

The contention that the contract was void by the act of Congress (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]) to "protect trade and commerce against unlawful restraints and monopolies," may be briefly disposed of. The contract undoubtedly operated upon interstate commerce as well as upon interstate

traffic; but if the views which we have expressed are correct as to its meaning and effect, it did not have any tendency to create a monopoly, or evidence any conspiracy in restraint of trade. It could only operate in restraint of trade by permitting Westcott to charge such extortionate rates to milk shippers as would discourage shippers; and this it did not permit or contemplate.

The contention that the contract contravened the provisions of the interstate commerce act may likewise be briefly disposed of. The argument for the plaintiff in error is that the contract is obnoxious to section 3 of that act (Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3155]) because it gave an undue and unreasonable preference to Westcott in the business of transporting milk. That act deals with the effects or results of contracts, and has no operation directly upon the contracts themselves; but assuming that the contract is void if the contention that it gave an undue and unreasonable preference is sound, the case is not one where any such preference was given. The wrong prohibited by the section is a discrimination between shippers. It was designed to compel every carrier to give equal rights to all shippers over its own road, and to forbid it by any device to enforce higher charges against one than another. Wight v. United States, 167 U. S. 516, 17 Sup. Ct. 822, 42 L. Ed. 258. The mere circumstance that there is, in a given case, a preference or advantage, does not of itself show that such preference or advantage is undue or unreasonable within the meaning of the act. Texas & Pacific R. R. Co. v. Interstate Commerce Com.. 162 U. S. 219, 220, 16 Sup. Ct. 666, 40 L. Ed. 940. To come within the inhibition of the act "the positions of the respective persons or classes between whom differences in charges are made, must be compared with each other, and there must be found to exist substantial identity of situation and service. accompanied by irregularity and partiality resulting in undue advantage to one, or undue disadvantage to the other." Interstate Commerce Com. v. B. & O. R. R., 145 U. S. 263, 282. 12 Sup. Ct. 844, 36 L. Ed. 699. Subject to the two leading prohibitions that their charges shall not be unjust and unreasonable, and that they shall not unjustly discriminate so as to give undue preference or disadvantage to persons or traffic similarly circumstanced, the interstate commerce act "leaves common carriers as they were at the common law, free to make special rates looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce and their own situation and relation to it, and generally to manage their important interests upon the same principles which are regarded as sound and adopted in other trades and pursuits." Interstate Commerce Com. v. Alabama Mid. R. R. Co., 74 Fed. 715, 21 C. C. A. 51, 41 U. S. App. 453; Id., 168 U. S. 144, 173, 18 Sup. Ct. 45, 42 L. Ed. 414.

The privileges accorded to Westcott were only those which were incident to the anomalous relations existing between him and the defendant created by the contract. It is quite inconceivable that

there were or could have been any shippers of milk who would have been willing or able to undertake his duties and responsibilities. In consideration of his assumption of peculiar obligations and hazards, the defendant gave him exceptional privileges appertaining to his relation as a manager of the traffic; this was not an undue and unreasonable preference.

The assignments of error which have been considered are the only ones which have been argued at the bar or on the brief of counsel. The repudiation of the contract was without any justification, for even if the contracts with the New York Central Railroad Company were theoretically competitive, they had been consented to by the officers of the defendant. The repudiation, as has been said, was announced when the contract had nearly expired, and when the defendant would shortly have secured exclusively for itself all the profits of the valuable traffic built up by Westcott. It was repudiated for sordid motives, and with an arrogance born of the scorn of consequences. The appropriation of Westcott's percentage of the money, which the defendant had actually collected for him, was morally no better than larceny. Although Truesdale was primarily responsible for this conduct, and the directors of the defendant may not have been personally cognizant of it, they cannot escape their share of the moral responsibility which ensues from endeavoring to establish the defenses interposed in the earlier action and in this action. It is conduct like Truesdale's, by those who manage the affairs of great corporations, that has aroused the spirit of resentment in the public mind which is so intense today, and which is not unlikely to result in legislation, and in municipal interference, which will bring serious loss upon stockholders.

We find no error in the rulings of the court below, and the judgment is accordingly affirmed.

LACOMBE, Circuit Judge. I am individually of the opinion that the contract of 1898 with the N. Y. Central Railroad was a breach of the plaintiff's contract with the defendant, because it was calculated to expose the Delaware, Lackawanna & Western R. R. to a competition which would operate to reduce the amount of its milk traffic. But that question is no longer open here. I concur in the finding that the evidence clearly shows that the defendant's officers knew of this contract and did not disapprove it, and in the conclusion that the prior judgment has conclusively established the proposition that neither such contract nor its carrying out is a breach available in defense. As to the second Delaware & Hudson contract, which I am fully convinced was a competing contract, the circumstance that both parties to it agreed that it should not go into effect until after the termination of the contract in suit, which agreement was strictly adhered to, in my opinion, eliminates it from consideration as a breach.

As to the other defenses I concur in Judge Wallace's opinion, and therefore concur in voting to affirm.