ALBERT RUSSEL ERSKINE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 36400, 41514.    Promulgated May 24, 1932.

*Robert N. Miller, Esq.*, and *J. Robert Sherrod, Esq.*, for the petitioner.

*W. F. Wattles, Esq.*, and *B. D. Daniels, Esq.*, for the respondent.

154

OPINION.

SMITH: The petitioner's contentions in these proceedings, as stated in his brief, are as follows:

(1) That no income [other than the $100,000 salary reported] was realized by him, except upon the sale of the stock.

(2) Alternatively, if petitioner realized any income as compensation prior to the sale of the stock it was realized in the year 1922 when the contract was received to the extent of its then value (not less than $800,000.00) and that any subsequent appreciation in value would be a capital gain realizable upon sale.

(3) Alternatively, if income was realized upon the purchase of the stock, petitioner's assignee, his wife, realized the income on the purchase of the preferred and common stock applicable to 1922 operations and the purchase of the preferred stock applicable to 1923 operations.

(4) The dividends in excess of 7 per cent declared on the shares of common stock held in escrow by the bankers, which inured to the benefit of your petitioner and his wife under said contract, should be taxable to your petitioner and/or his wife only at surtax rates as dividends and not also at the normal rates as determined by the respondent.

It seems to us that the controlling question in these issues is whether the agreement of June 27, 1922, is to be regarded essentially as a contract of employment or whether it is, at least in part, a contract of purchase and sale. In other words, did the value of the rights to buy the shares of stock of the Studebaker Corporation in excess of the price required to be paid for them each year upon the terms and conditions named in the agreement represent compensation for services actually rendered? If so, then such compensation

to whatever extent it represents realized income is taxable to the petitioner in the years of its receipt, notwithstanding his assignments of all or a part of it to his wife in 1922 and 1923. *Lucas* v. *Earl*, 281 U. S. 111.

The agreement itself, which appears in full above, bears all of the essential characteristics of an ordinary employment contract. The petitioner was to serve as president of the corporation, or in some position of equal dignity, for a period of between four and five years, beginning January 1, 1922, and was to receive a fixed annual salary of $100,000 and further consideration in the form of rights to acquire certain shares of stock of the corporation at an advantageous price, contingent upon the corporation's profits.

It is well established by the evidence, and the petitioner does not deny, that the rights to acquire the shares of stock at the prices named in the agreement were of great value. The contention is made, however, that the predominant motive of the corporation in entering into the agreement was to have the petitioner become a substantial stockholder in the corporation, and that the rights to acquire the shares of stock were offered for that purpose and not as compensation for the petitioner's services. This was the burden of the testimony of Frederick S. Fish, chairman of the board of directors and the controlling figure in the corporation at that time.

We have no reason to doubt that one of the purposes of the corporation in entering into the agreement was to have the petitioner become a large stockholder, nor do we question the wisdom of the plan adopted for carrying out that purpose. However, we do not understand that this answers our question. What we must determine is whether and to what extent what was received by the petitioner under the agreement is taxable to him as compensation. It is well to observe that the purpose of the corporation to have the petitioner become a substantial stockholder might have been carried out just as effectively by other plans which would have left no doubt as to the petitioner's tax liability upon the receipt of the shares of stock. For instance, the agreement might have provided that the petitioner should receive for his services the fixed yearly salary of $100,000 and the right to a certain number of shares of stock of the corporation to be determined upon the basis of the earnings. Or, it might have provided that the petitioner should receive only the right to shares of stock for his services. In either case the rights would be taxable to the petitioner as compensation in the year when received by him, if reporting on a cash basis, to the extent of their fair market value at that time. *Rodrigues* v. *Edwards*, 40 Fed. (2d) 408; *Lyle H. Olson*, 24 B. T. A. 702; *James R. Lister*, 3 B. T. A. 475; *Roscoe H. Aldrich*, 3 B. T. A. 911; *Anthony Schneider*, 3 B. T. A. 920; *Charles*

*F. Pearce, Jr.*, 6 B. T. A. 450; *Charles R. Johnson*, 8 B. T. A. 992; *C. A. Tilt*, 14 B. T. A. 437; *Fred J. Collins*, 16 B. T. A. 1426; *H. L. Carnahan*, 21 B. T. A. 893. The final results were the same as if the petitioner had received only the rights to the shares of stock for each year's services, since he was required to pay back to the corporation the exact amount of his cash salary already received in exchange for the shares of stock to which he was entitled in each year.

We are convinced from a study of the instrument itself and the circumstances disclosed by the evidence that the agreement must be considered primarily as a contract of employment. It superseded a prior employment agreement under which the petitioner had received a total compensation of $256,276.40 in 1920, $342,963.17 in 1921, and $382,636.85 in 1922, although his regular salary was not in excess of $100,000 in either year. These amounts represented the regular annual salary and bonuses computed on the prior year's profits. With the prospect favorable for a continuation of the corporation's large profits the petitioner might reasonably have expected to receive, under the prior employment agreement, compensation of at least $300,000 or $400,000 a year. In the new agreement the corporation sought to reward the petitioner on account of " the very satisfactory and gratifying condition of the Corporation due in large measure to your able administration." This purpose certainly would not have been served by reducing the petitioner's compensation to one-third or one-fourth of that received under the prior agreement. Yet, that is the result if we eliminate from the petitioner's compensation under the new agreement his rights with respect to the acquisition of the shares of stock. The contract does not expressly limit the petitioner's total compensation to $100,000 a year. It merely provides for a fixed yearly salary of that amount. The rights to acquire the shares of stock, contingent upon profits, may reasonably be considered as taking the place of the cash bonus which was paid under the priod contract.

We see no basis for construing that portion of the agreement relating to the petitioner's rights to acquire the shares of stock separately as a contract of purchase and sale. In the first place, the petitioner was not obligated to purchase the stock, but might do so at his own option, contingent upon the corporation's profits. The only true consideration for which the petitioner was obligated was his promise to serve the corporation for the period covered by the agreement. This consideration undoubtedly extended to all of the provisions of the contract. The petitioner's promise to pay at his own option $10 and $25 per share, respectively, for the common and preferred shares that had a ready market value of many times those

amounts would hardly constitute a fair or adequate consideration to support a contract of purchase and sale. The officers and directors of the corporation had no lawful right to make a gift to the petitioner of any part of the value of the shares of stock, or to " sell " them to the petitioner at a price known to be considerably less than their cost or market value. We must assume that the officers and directors did not act unlawfully. *Noel* v. *Parrott*, 15 Fed. (2d) 669.

We are aware that the agreement refers to the petitioner's rights to acquire the shares of stock as the " option to buy and receive," but we must look to the things done rather than to the language employed, to the substance rather than the form. *Weiss* v. *Stearn*, 265 U. S. 242. As said in *Alger-Sullivan Lumber Co.* v. *Commissioner*, 57 Fed. (2d) 3 :

> The use of the word " sale " in a contract does not necessarily conclusively determine its character. Its meaning may be qualified and the word deprived of its ordinary force by other provisions of the agreement. * * *

In that case the court reversed the Board's decision (20 B. T. A. 1109) in which the Board denied the taxpayer, the employer corporation, the right to deduct as a business expense the market value of certain shares of its stock allegedly paid to its employees as compensation. The court further said :

> * * * It is evident that petitioner intended in good faith to give bonuses in stock to valued employees as additional compensation and there was no intention to make an outright sale of stock to them. The Board was wrong in holding the transactions to be sales.

In *Martha Briggs Phelps, Executrix* v. *Commissioner*, 54 Fed. (2d) 289, the court said :

> If, under the facts stated, we are bound by the plain meaning of the language employed in the resolution referred to in the statement of facts, then of course the transactions in controversy should be considered as sales, for that is what the resolution termed them, and pursuant thereto there was an exchange of stock for money. But in all relations of life it oftentimes happens that the thing done speaks so audibly that equity is prevented from hearing the language of the parties, and will classify the act by its real name rather than by the name which the interested parties have given it. In such instances the substance of the transaction will control the form, and the Board therefore was warranted in considering both form and substance in arriving at its conclusion. *United States* v. *Phellis*, 257 U. S. 156 ; *United States* v. *Klausner*, 25 F. (2d) 608.
>
> That taxing statutes cannot be intentionally circumvented by anticipatory arrangements and contracts is settled by the principle laid down in *Lucas* v. *Earl*, 281 U. S. 111. * * * In liquidation of corporations it is quite proper and usual to take up the certificates of stock upon making the final distribution of assets. Such a transaction, however, is not to be regarded primarily as a sale of stock, although it has some such characteristics. It is more than a sale ; it is primarily a liquidating distribution, and the sale, if it be such, is but an incident to the transaction. * * *

That the Studebaker Corporation regarded the entire agreement as an employment contract is indicated by the fact that in its income-tax returns for the years 1923, 1924, 1925, and 1926 it deducted as compensation paid to the petitioner not only the yearly salary of $100,000, but also amounts representing approximately the value of the shares of stock acquired by the petitioner under the agreement in each year less $100,000, the amount paid for them by the petitioner or his assignee. The petitioner himself, as president of the corporation, signed the returns. He testified that he knew at that time that the corporation had deducted the cost of the shares of stock, but did not know that the deductions were classified as compensation paid to him. The fact that the corporation in its returns treated the transfers of the shares of stock to the petitioner as payments for compensation is, of course, not determinative of the petitioner's tax liability, but unquestionably it does show that the corporation put a different construction upon the agreement from that contended for by the petitioner. In *Noel* v. *Parrott, supra*, the court said:

* * * It needs neither argument nor citation of authority to establish the proposition that the directors were without authority to give away the corporate assets, and that for them to make to several of their members and other persons a gift of a large sum of money from the corporate assets would be neither "wise" nor "proper," and would amount to an illegal misapplication of corporate funds. We must assume that the directors did not intend such a flagrant violation of their trust. *Delaware, L. & W. R. Co.* v. *Kutter*, (C. C. A. 2nd) 147 F. 51, 77 C. C. A. 315; *Hobbs* v. *McLean*, 117 U. S. 567, 6 S. Ct. 870, 29 L. Ed. 940; *U. S.* v. *Cent. Pac. R. Co.*, 118 U. S. 235, 6 S. Ct. 1038, 30 L. Ed. 173. It is no answer to this position to say that the stockholders ratified the gift by accepting the offer of $75 per share after notice that the distribution was to be made, for we are dealing with the interpretation of the resolutions, not with the validity of the action taken under them. And that this interpretation was the one intended is shown by the subsequent action of the corporation in claiming the disbursements made under the resolution as salary deductions from gross income.

The agreement here placed no restriction whatever upon the sale of the stock by the petitioner. On the day of its receipt in each year the petitioner might have sold all of the shares of stock in the open market at prices commensurate with the amounts which the respondent has included in the petitioner's income. It was entirely optional with the petitioner whether he should keep the shares of stock or should immediately convert them into cash. Since there was admittedly a readily realizable market value for the stock this was tantamount to an option to receive either the shares of stock or the equivalent, that is, the differential in value, in cash.

It has been recognized that under some conditions rights to purchase shares of stock may constitute taxable income. In *B. F. Saul*, 4 B. T. A. 639, the petitioner and other stockholders of a District of

Columbia bank sold their shares of stock in the bank, receiving for each share $400 cash and the right to subscribe for four shares of other stock in a newly organized trust company at $100 a share. The new stock had a value of $220 a share.   We said:

* * * The right of each Bank stockholder to purchase four shares of the Trust Company's stock at $100 a share was a part of the consideration which the Trust Company agreed to pay for the Bank's stock, and the value of that right should be considered in measuring the profit realized by the Bank stockholders to the same extent as if it had been cash. The amount received by the Bank stockholders for their stock was, therefore, $400 a share, plus the value of the right to subscribe for four shares of the Trust Company's stock at par.

Under the provisions of the contract and under all of the evidence submitted, the Board is of the opinion that the fair market price or value of the right received by each Bank stockholder to subscribe to the Trust Company's stock at par was $120 a share. The result therefore is that the price received by each Bank stockholder for each share of Bank stock sold was $400, plus $480, the value of the right to subscribe for four shares of the Trust Company's stock, or $880 a share. This amount, less the cost or March 1, 1913, value of the Bank stock, which is not in dispute, is the proper measure of the profit per share of the Bank stock to each of these taxpayers.

*James F. Shea,* 11 B. T. A. 557, involving the identical facts, the taxpayers being other parties to the same transaction, was decided upon authority of the *Saul* case. The latter case was appealed and was affirmed by the Court of Appeals of the District of Columbia in *Moran* v. *Lucas,* 30 Fed. (2d) 546. The court in its opinion said:

It appears by competent and convincing evidence that at the time of this transaction the stock of the American Security & Trust Company possessed a fair market value of $220 a share. In practical effect therefore the owner of a share of stock in the Home Savings Bank received $400 in cash for each share of stock transferred by him, and became entitled to convert the $400 thus received into four shares of the stock of the American Security & Trust Company, having at the time an aggregate fair market value of $880. The modus operandi thus pursued was induced by certain restrictions prescribed by the laws relating to corporations in the District of Columbia. However, it was manifestly contemplated by the contract that the vendor of each share of stock would avail himself of the right to secure, in payment thereof, the stipulated shares of stock in the other corporation having a value of $880, instead of resting satisfied with $400 in cash.

*        *        *        *        *        *        *

Appellants contend that the subscription right was not transferable, and therefore had no market value. We do not agree with this view, for it does not appear that the right, when matured, was not transferable, and in any event it was a property right which permitted the holder of each share of stock to buy for $100 a security having a present market value of $220. It may be noted that the appellants in fact availed themselves of this right, and that it was a substantial part of the consideration which induced them to part with their original holdings.

*        *        *        *        *        *        *

160

The appellants contend that the subscription right cannot represent any taxable income until a sale is made of the stock purchased under its terms. It is argued that, until a sale is made, the value of the stock thus secured cannot be definitely ascertained, nor determination made of the loss or profit resulting therefrom. We think, however, that the question is one of present value, and the price realized on actual sales made in the usual and customary manner is admissible to fix such value. See *Appeals of B. F. Saul, et al.,* 4 B. T. A. 639, involving the same transaction as this, but with other stockholders as parties.

We can see no difference in principle between those cases and the instant case. There, the rights to subscribe for the shares of stock at less than value were received in consideration for the sale of other stock. Here, the rights to subscribe for the stock at less than value were received in consideration for services performed. The question of the taxability of the rights to receive the shares of stock is substantially the same.

The instant case is distinguishable from those in which it has been held that no taxable gain results from the bona fide purchase of shares of stock at a bargain price, *Rose* v. *Trust Co. of Georgia,* 28 Fed. (2d) 767; *George W. Van Vorst, Executor,* 22 B. T. A. 632; *Taplin* v. *Commissioner,* 41 Fed. (2d) 454; *Miles* v. *Safe Deposit & Trust Co.,* 259 U. S. 247, or from the purchase by an officer or employees, under a general corporate plan, of shares of stock of a corporation at par or for less than market value, *Durkee* v. *Welch,* 49 Fed. (2d) 339. In *Durkee* v. *Welch, supra,* one of the cases relied upon by the petitioner, the court said:

The plan involved in this case does not present any question of bonus or profit sharing as such terms are used in income tax matters. The corporation offered an opportunity to its employees, in order to arouse their interest in the welfare of the company and to increase their efficiency as workers therein, to become participants in its prosperity by purchasing its common capital stock and by paying the full par value thereof out of their own money. There was no gift of the stock and there was no distribution of it as a bonus. The right or privilege conferred upon such employees was substantially the same as corporate transactions whereby stockholders are permitted to subscribe at par for stock which is worth more than par in the market. Such transactions result in no taxable income to the purchasing stockholders until they shall have sold their stock and actually realized a profit thereon. *Miles* v. *Safe Deposit Co.,* 259 U. S. 247, 42 S. Ct. 483, 66 L. Ed. 923. I see no reason for discriminating between stockholders of a corporation who are thus permitted to purchase stock at par and employees of a corporation who are permitted to do the same thing.

\*　　\*　　\*　　\*　　\*　　\*　　\*

\* \* \* It is incorrect to state that the plaintiff received his stock as part of a profit-sharing plan in the nature of compensation for service rendered as an employee of long standing, because under the terms of the arrangement plaintiff could have paid the full amount of the purchase price the day after he made his subscription and could have taken his stock at that time and

could have left the employ of the company. Under such circumstances, it cannot be said that the stock is in reality compensation for future services, or that any value of the stock in excess of the amount paid for it was additional compensation.

The facts in the instant case are materially different. The agreement under which the petitioner received his rights was no part of a general corporate plan. It included no other officer or employee. There is ample evidence, too, that the petitioner's rights to acquire the stock were " in the nature of compensation for services rendered " or a " bonus." The petitioner here could not have bought his shares of stock until he had performed the services required of him. He assumed no risk in the possible event of a subsequent decline in the market value of the shares below the price named in the agreement because he was under no obligation to purchase them.

The petitioner also relies upon *Rose* v. *Trust Co. of Georgia, supra.* In that case, the Circuit Court of Appeals for the Fifth Circuit, affirming the lower court, held that a transaction through which certain shares of stock were purchased at a price considerably less than their market value resulted in no taxable gain to the purchasers, since the transaction was a " purchase in good faith." The court said:

Conceding that compensation for personal services may be paid in property, instead of in money, and that income taxes may be assessed on the value of the property, we agree with the District Court that the transaction here in question was a purchase in good faith. In such case no taxable income would be derived until the disposal of the stock, except, of course, that arising from dividends. *Eisner* v. *Macomber*, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570; *McCaughn* v. *Ludington*, 268 U. S. 106, 45 S. Ct. 423, 69 L. Ed. 868.

The facts permitting, we would unhesitatingly apply that principle in the instant case but, as we have said, we can not regard the substance of the transactions here merely as a purchase and sale. This does not imply, as the petitioner argues it must, that the transaction was a fraudulent and unlawful attempt to evade taxes or even that it was an attempt lawfully to avoid the taxes. We are not confronted with these alternatives in the matters before us. Our question is whether the transaction was in substance and effect a plan to compensate the petitioner for his services, or a bona fide purchase and sale. Cf. *L. Schepp Co.*, 25 B. T. A. 419, 436; *Taplin* v. *Commissioner*, 41 Fed. (2d) 454; *Budd* v. *Commissioner*, 43 Fed. (2d) 509. There is not the slightest evidence of the latter except as found in the bare words of the agreement.

We doubt that a further discussion of the numerous cases cited by the parties in support of their contentions with respect to this issue would prove helpful. It suffices to say that we do not regard

any of them as controlling here. Our determination that the entire value derived by the petitioner under the agreement of June 27, 1922, represented compensation for services rendered to the Studebaker Corporation is necessarily based upon the facts disclosed by the evidence in this case. See *Joseph W. Robinson*, 21 B. T. A. 907; *E. Louis Jacobs*, 20 B. T. A. 529.

The petitioner's alternative contention that the income, if any, received by him as compensation under the agreement was realized in 1922 when the agreement was entered into, or when the contract was received by him, to the extent of its then value of not less than $800,000, must also be denied. While the contract may have had the assignable value claimed for it by the petitioner at the time of its receipt, this value does not in any sense represent realized income to the petitioner in that year. It could not be determined definitely until the end of each year and until the profits had been computed just what amount of stock the petitioner would be entitled to buy under the agreement. With exceptions not here material, the petitioner was not entitled to buy any of the stock until he had performed the services required of him. The construction of the agreement as a contract for services to be performed by the petitioner seems in itself a complete denial of the contention that the income resulting therefrom was realized in the year of the execution of the contract rather than in the years of its performance. The statute clearly provides that the " gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid * * * shall be included in the gross income for the taxable year in which received by the taxpayer." See section 213 (a), Revenue Acts of 1921, 1924, and 1926.

A similar question was considered by the Board in *John A. McPherson*, 22 B. T. A. 390. The petitioners in that case were contending that the amounts received by them in subsequent years in performance of certain contracts entered into prior to 1913 were taxable to them only to the extent of the excess of such amounts over the March 1, 1913, value of the contracts. The Board, in denying the contention, said:

* * * Petitioners, on March 1, 1913, not only had no right to demand any specific sum, but had no right to make any demand under the contracts. What, if anything, they were to receive depended entirely on what the future might hold. Payment, when and if made, was to be not only for services rendered by the partnership prior to March 1, 1913, but covered as well services to be rendered by the petitioners after that date. They were to continue to perform certain duties until such time as the timber would be sold and it was impossible at March 1, 1913, to tell when that would be.

Regardless of whether the contracts had an ascertainable value at the basic date, the question of law presented has been decided adversely to petitioner's claim in a number of cases. * * * [Citing *Edwards* v. *Keith*, 231 Fed. 110,

certiorari denied, 243 U. S. 638; *Woods* v. *Lewellyn*, 252 Fed. 106; *Workman* v. *Commissioner*, 41 Fed. (2d) 139, affirming *W. F. Workman*, 14 B. T. A. 1414; *E. S. Jones*, 6 B. T. A. 1048; and *J. Noble Hayes*, 7 B. T. A. 936].

See also *Benedict Crowell*, 21 B. T. A. 849; *Old Colony Trust Co. et al., Administrators*, 22 B. T. A. 1062; *Kaufmann Department Stores, Inc.*, 11 B. T. A. 949; affd., 34 Fed. (2d) 257.

We are also of the opinion that the respondent was correct in allocating to the years 1923, 1924, 1925, and 1926 the additional compensation or bonus received in those years based upon the profits of the business in the preceding years 1922 to 1925, respectively. The contract of June 27, 1922, provided that the petitioner should "have the right and option to buy and receive, at any time after the completion of the annual audit for any and each such year and prior to January 1, 1927," the additional shares which were acquired. The audit for 1922 was not completed until sometime in 1923, shortly after which the compensation shares were acquired by the petitioner or his assignee. The same is true for the subsequent years. The amount of the bonus or additional compensation received each year was the value of the rights to acquire the additional shares with accrued dividends. The respondent has computed this value as the difference between the market value of the shares with accrued dividends over the price which the petitioner was required to pay therefor. No evidence was offered that the value of the rights was otherwise.

As we have already indicated, we are of the opinion that the issue relative to the petitioner's assignments to his wife in 1922 and 1923 of his rights to acquire certain of the shares of stock, such rights representing compensation for services to be performed, is controlled by the decision of the Supreme Court in *Lucas* v. *Earl, supra*. The petitioner seeks to distinguish the instant case largely upon the grounds that the assignments here were of the option to purchase the shares of stock and not, as in the *Earl* case, of future earnings from services to be performed. This distinction is, of course, predicated upon the petitioner's earlier contention, which we have decided adversely.

At the time of the assignments here the petitioner had no clear option to purchase any of the shares of stock. His rights to acquire the stock depended entirely upon the contingency of the corporation's earnings and the continuation of his services. The option itself at its maturity represented compensation for services.

As we understand the *Earl* case, it holds that future income from personal services can not be assigned to another so that it will not be taxable first to the assignor who earns it. Citing the sections of the Revenue Act of 1918 corresponding to those of the later acts applicable to the years here involved, the court said:

\* \* \* There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew.

In his supplemental brief the petitioner cites *Ferguson* v. *Nelson*, 51 Fed. (2d) 121. In that case the taxpayer in 1917 assigned to his wife his interest in a certain contract under which he was to receive from a corporation one-third of the profits from a patented article invented by him. The court, in holding that the income from such contract in the years 1917 to 1921, inclusive, was taxable to the assignee, pointed out that the assignment was of a " property right presently existing " and not " of future earnings of the assignor arising out of his future services, as in the *Earl* and *Luce* cases." There is nothing in the court's opinion in the *Earl* case to indicate that any different conclusion would have been reached if the assignment there had been of the assignor's interest in an employment contract under which he was to receive compensation for personal services. *Elizabeth D. Smith et al., Executors*, 25 B. T. A. 291, and *William Ernest Seatree*, 25 B. T. A. 396, also cited by the petitioner, are distinguishable upon the same grounds as *Ferguson* v. *Nelson*, *supra*.

If we are correct in our conclusion that the value of the rights measured by the excess value of the shares of stock acquired by the petitioner or his assignee in each year under the agreement represented compensation for services, then, under the rule in the *Earl* case, we think that such compensation must be taxed to the petitioner as his own income, regardless of the assignments to his wife. See also *Burnet* v. *Leininger*, 285 U. S.; 136; *Edward J. Luce* v. *Burnet*, 55 Fed. (2d) 751; *Parker* v. *Routzahn*, 56 Fed. (2d) 730.

The remaining issue is whether the dividends in excess of 7 per cent declared on the common stock held by the escrow agent and received by the petitioner or his wife along with such shares of stock in 1923, 1924, 1925, and 1926, are taxable to the petitioner as dividends at the surtax rate only, or as ordinary income at both the surtax and normal rates.

We can see no reason for treating the accrued dividends, which under the terms of the agreement went to the petitioner along with the shares of stock, in any different manner from the rights to buy the shares of stock themselves, that is, as compensation for services. The petitioner was not a stockholder in respect of the escrow stock until it was received by him. The dividends declared thereon dur-

ing the escrow period were therefore not the petitioner's dividends. It was not known at the time of the declaration of the dividends whether the petitioner would ever receive the stock or the dividends. In *Roscoe H. Aldrich*, 3 B. T. A. 911, we held under similar facts that certain amounts representing dividends declared on shares of stock held in escrow for payment to an employee as compensation for services under a five-year employment contract were taxable to the petitioner as compensation. We are of the opinion that the amounts of the dividends received by the petitioner in each of the years as shown above are taxable to the petitioner as ordinary income and not as dividends.

It appears from the deficiency notices that the respondent has added to the petitioner's income as compensation received in each year the difference between the amount of cash which the petitioner paid in acquiring the shares of stock and the fair market value of the stock received at that time, plus the accrued cash dividends in excess of 7 per cent which were turned over to the petitioner or his wife with the shares of stock. For illustration, the deficiency notice covering the year 1926 shows an addition to salary of $979,-176.56, with the explanation that " this amount is the excess value of compensation stock over amount paid by you, plus amount measured by excess of dividends of 7% paid into escrow account before ownership of the stock." We assume that the respondent has correctly determined the fair market value of the shares of stock in question and of the rights to buy such shares upon the dates of their receipt by the petitioner and his wife, since no objection on this point has been raised. The amount thus determined in respect of the rights to buy the shares of stock received in each year plus the cash salary of $100,000 is the amount of compensation taxable to the petitioner in each of the years 1923 to 1926, inclusive.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*