PHILLIP W. HABERMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

FRANK W. COLLINS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 54426, 59149, 62542. Promulgated August 10, 1934.

*Bernhard Knollenberg, Esq.,* for the petitioners.
*John E. Marshall, Esq.,* for the respondent.

### OPINION.

MURDOCK: The Commissioner determined deficiencies as follows:

| Name | Docket No. | Year | Amount |
|---|---|---|---|
| Phillip W. Haberman | 54426 | 1928 | $6,834.32 |
| Do | 62542 | 1929 | 5,481.71 |
| Frank W. Collins | 59149 | 1928 | 1,404.00 |

The parties have disposed of all issues save one which is common to all three proceedings. A stipulation of facts was filed.

Haberman was vice president and general counsel, and Collins was secretary, of the Commercial Investment Trust Incorporated at

all times material hereto. That corporation was a subsidiary of the Commercial Investment Trust Corporation. Haberman, on June 1, 1926, entered into a contract with Commercial Investment Trust Corporation, and the Commercial Investment Trust Incorporated joined in that contract. The contract is in the form of a letter from the Commercial Investment Trust Corporation, addressed to and accepted by Haberman. It is in part as follows:

NEW YORK, *June 1, 1926.*

Mr. P. W. HABERMAN,
        *New York City.*

DEAR SIR:

For some time past you have been in the employ of Commercial Investment Trust Incorporated, a subsidiary of this Corporation, under a year to year contract and in addition to salary thereunder you have received from time to time additional compensation in cash. We write this letter to confirm our understanding that the earlier arrangement of said subsidiary with you has been cancelled and you are to be employed by it in the same capacity as before for a period of three years beginning January 1, 1926, during which employment you will not engage in or devote your time to any other enterprise. Your compensation is to be as follows:

(1) A cash salary payable in equal monthly installments. For the first year such salary is to be $25,000. Unless altered by agreement between us the salary of the second year and of the third year will be the same.

(2) Additional compensation in the form of a right hereby given you to purchase 3,600 shares of common stock of Commercial Investment Trust Corporation on terms advantageous to you, one-third of which amount you are permitted to purchase in each of the three years on the terms more fully set out in the succeeding paragraphs.

All of the above mentioned shares of stock have been issued and fully paid for by others than yourself. Certificates numbered as hereinafter set forth have been made out in your name, endorsed by you and deposited with us as security for an advance of $126,000 made to you by us to assist you in purchasing the stock. This sum, together with interest at the rate of 5 per cent per annum from January 1, 1926 on the unpaid balance thereof as it exists from time to time, you will by acceptance of this letter agree to repay to this Corporation. If you fail to take up any of the allotments of stock hereinafter described at the time and on the terms stated, all your rights as to all stock held in your account are automatically terminated, but you shall then be under no obligation to the Corporation with respect to the loan or otherwise subject to liability because of your failure to take up the stock; but if you shall have made prepayment of or on account of any stock not at such time deliverable to you the amount of such prepayment shall be refunded to you.

An account in your name has been opened by the Corporation and you are now charged therein with an indebtedness in the amount of the advance above named and are credited with the number of shares of common stock above stated deliverable from time to time as herein provided. The above shares of stock for the purposes of this agreement are divided into three equal parts of 1,200 shares each, called respectively Allotments A, B, and C.

A. If you shall repay to the Corporation on or before January 2, 1927, the sum of $42,000 together with interest on the entire balance of your account to the date of payment, you will be entitled to receive Allotment A on January

2, 1927 (but not before that date unless the Corporation shall elect to advance the date of delivery) free and clear of all indebtedness provided that on July 1, 1926 you were still in the employ of a subsidiary or affiliated company and provided further that if for any reason you shall on or before June 30, 1926, cease to be in such employ, then upon repayment on or before July 1, 1926, of one-half of the sum above stated in this Paragraph "A" together with interest on the entire balance of your account to the date of payment, you will be entitled to receive one-half of Allotment A and you will have no further rights or obligations hereunder, or with respect to any of the stock allotted to you.

B. If you shall have taken and paid for Allotment A and after January 2, 1927, and on or before January 2, 1928, you or your assigns (as hereinafter limited) shall repay to the Corporation the sum of $42,000 together with interest on the entire balance of your account to date of payment, you, or your assigns as the case may be, will be entitled to receive Allotment B on January 2, 1928 (but not before that date unless the Corporation shall elect to advance the date of delivery) free and clear of all indebtedness provided that on July 1, 1927 you were still in the employ as aforesaid, provided further that if for any reason you shall after December 31, 1926, and on or before June 30, 1927, cease to remain in the employ of a subsidiary or affiliated company, then upon repayment on or before July 1, 1927, of one-half of the sum above stated in this paragraph "B" together with interest on the entire balance of your account to the date of payment, you or your assigns (as hereinafter limited) will be entitled to receive one-half of Allotment B, and neither you nor your assigns shall have any further rights or obligations hereunder or with respect to any of the stock allotted to you.

C. If you, or your assigns as the case may be, shall have taken and paid for allotments A and B and after January 2, 1928, and on or before January 2, 1929, you or your assigns (as hereinafter limited) shall repay to the Corporation the sum of $42,000 together with interest on the entire balance of your account to date of payment, you, or your assigns as the case may be, will be entitled to receive Allotment C on January 2, 1929 (but not before that date unless the Corporation shall elect to advance the date of delivery) free and clear of all indebtedness provided that on July 1, 1928, you were still in the employ as aforesaid and provided further that if for any reason you shall after December 31, 1927, and on or before July 1, 1928, cease to remain in the employ of a subsidiary or affiliated company, then upon repayment on or before July 1, 1928, of one-half of the sum above stated in this paragraph "C" together with interest on the entire balance of your account to the date of payment, you or your assigns (as hereinafter limited) will be entitled to receive one-half of Allotment C, and neither you nor your assigns shall have any further rights or obligations hereunder or with respect to any of the stock allotted to you.

All of your rights with respect to Allotment B or Allotment C, or both, at any time may be assigned by you to your wife, or to any child or children of yours, but to no other person without our written consent thereto. After written notice to the Corporation of any such assignment the Corporation will look to such assignee or assignees for repayment of the indebtedness with respect to the Allotment involved.

While any stock not theretofore taken up by you is being held for your account, cash dividends when received thereon will be credited first to interest on the loan to you, then to the principal thereof; stock dividends when received will be added to the respective Allotments of stock held for your account, and

certificates representing any rights to subscribe issued to the record holder of the stock immediately upon receipt will be turned over to you or your assigns as above defined.

As further consideration for this agreement, you shall be entitled to have credited upon your indebtedness, if any (or paid to you if there shall then be no indebtedness or the Corporation shall elect to make payment), on January 2, 1927, 1928 and 1929 respectively, an amount equivalent to the saving in corporate income tax resulting from the deduction of amounts to be credited (or paid) to you under this contract for the preceding years, excluding the amount payable under this paragraph. It is our understanding that under the existing tax laws such a deduction is allowable for the sum of the amount payable under this paragraph and all cash dividends and the value of all stock rights paid or issued to you during the year with respect to stock not deliverable hereunder at the time of such payment or issue, together with the excess, over $35 per share, of the fair market value at date of delivery, of any stock which during the year is delivered to you hereunder or which this corporation shall be unconditionally obligated during the year to deliver to you, free and clear of all restrictions hereunder less interest paid or charged hereunder on your indebtedness during the year. On or about December 31, 1926, and on or about December 31, 1927 and on or about December 31, 1928 you will be advised of the amount to be claimed by the corporation as a deduction from its taxable net income on account of the payment to you or the liability to pay to you the items above mentioned, and you will also be advised of the amount to be reported by the Corporation as paid to you with respect to such items. If for any reason the Corporation is denied any portion of such deduction, you shall be charged with or shall repay an appropriate portion of the amount credited or paid to you under this paragraph as the anticipated saving in corporate income tax which is not in fact saved by reason of such disallowance.

The opportunity to purchase stock under the terms hereof shall continue even if your employment should change so that some other subsidiary or affiliated company of the Corporation should be your employer; but it is at all times dependent upon your continuance in the employ of one of our subsidiary or affiliated companies. You are to understand that if you cease to continue in such employ (unless such cessation be by death) your rights hereunder (and the rights of your assignees) terminate as hereinbefore stated whether the discontinuance is voluntary or involuntary on your part.

\*  \*  \*  \*  \*  \*  \*

The undersigned Company, a subsidiary of the above mentioned Commercial Investment Trust Corporation, being the company in the foregoing letter referred to as and which is the employer of the addressee, to whom the foregoing letter is addressed, joins in the execution of the foregoing agreement for the purpose of accepting the benefits thereby conferred upon it and of assuming and being bound by the obligations and liabilities thereby imposed upon it.

June 1, 1926.

COMMERCIAL INVESTMENT TRUST INCORPORATED
[Signed] By EDWIN C. VOGEL,
*Vice-President.*

Collins on the same day entered into a contract which was identical with the above contract except for his name and the amounts. His salary was to be $12,500 in cash and a right to purchase 900 shares.

Haberman received 1,200 shares of Commercial Investment Trust Corporation stock on January 2, 1928, and 1,200 shares on January 2, 1929, pursuant to his contract. He completed the cash payments of $35 per share for the first 1,200 shares in 1927 and for the second 1,200 shares in 1928.

Collins received 300 shares of Commercial Investment Trust Corporation stock on January 2, 1928, pursuant to his contract. He completed the cash payments of $35 per share for this stock in 1927.

Both taxpayers kept their accounts and filed their income tax returns on a cash receipts and disbursements basis.

The fair market value of the Commercial Investment Trust Corporation common stock was $57 per share on June 1, 1926, $62 per share on January 2, 1928, and $71.50 per share on January 2, 1929.

The Commissioner added $32,400 to Haberman's income for 1928 as additional salary, being the difference between the cost of 1,200 shares of Commercial Investment Trust Corporation stock at $35 per share and its fair market value of $62 per share. For 1929 he added $43,800 to Haberman's income as " Income from Commercial Investment Trust, Inc., increased ", but the record contains no further details or explanation of this adjustment.

The Commissioner added $8,100 to Collins' income for 1928, representing the difference between the cost of 300 shares of Commercial Investment Trust Corporation stock at $35 per share and its fair market value of $62 per share.

The sole question for decision is whether or not the Commissioner erred in making these additions to income. The petitioners argue, first, that the contracts were for the purchase of stock and no income results from a purchase of stock by an employee from an employer at less than fair market value. The same argument based upon the same court decisions was fully considered in the case of Albert Russel Erskine, 26 B.T.A. 147. The Board held that the contract there in question was essentially one of employment and all that was realized therefrom by the petitioner was compensation for services and income at the time received. There is no need to repeat the discussion of the Erskine case. The contracts in question here were obviously contracts of employment providing for the payment of compensation for services to be rendered by these petitioners. All that each received under these contracts was income, including cash and other valuable rights and benefits. Sec. 22 (a), Revenue Act of 1928; Regulations 74, arts. 51 and 53.

An alternative argument of the petitioners is that they had agreed to retain the stock purchased under their contracts and, consequently, the value of the stock would not be the same as that of free stock. Haberman testified that in discussions preceding the execution of

the contracts the president of the Commercial Investment Trust Corporation " laid it down as a condition precedent to any of the executives having the opportunity to accept this contract and sign it, the understanding that the stock would be acquired by these executives for permanent investment and not for speculation." It does not appear that Collins knew of this attitude on the part of the president. No such restriction was embodied in the contracts. No time was fixed during which the stock would not be disposed of. The record does not show that there was any restriction upon sales of the stock which would make any particular stock less valuable than other stock. Cf. *James Couzens*, 11 B.T.A. 1040, 1163, 1164; *Wilbur F. Burns*, 30 B.T.A. 163, 173 *et seq.; T. W. Henritze*, 28 B.T.A. 1173; *William O. Newman*, 10 B.T.A. 158; affd., 40 Fed. (2d) 225; rehearing denied, 41 Fed. (2d) 743; certiorari denied, 282 U.S. 858; *Rodrigues* v. *Edwards*, 40 Fed. (2d) 408. The Commissioner has used certain values and the parties have stipulated that those values are correct values of the Commercial Investment Trust Corporation stock. No other values have been proved. Thus in no event would this argument aid the petitioners (cf. *Fesler* v. *Commissioner*, 38 Fed. (2d) 155, affirming 13 B.T.A. 1356; certiorari denied, 281 U.S. 755), for without some definite value the Board would be unable to determine a definite tax liability differing from that determined by the Commissioner.

Finally the petitioners contend that their income was received, if ever, when the right to subscribe for stock at less than market value unconditionally vested in them; this right, with respect to one half of allotment B, unconditionally vested in them on July 1, 1927, and, with respect to the other one half of that allotment, on December 31, 1927; therefore on the cash receipts and disbursements basis they received this alleged income in 1927 and not in 1928 as determined by the Commissioner. A similar argument would be applied to show that income from rights to purchase allotment C was received in 1928 and not in 1929 as determined by the Commissioner. Collins would thus escape tax entirely, since 1927 is not before the Board and the Commissioner has neither made an alternative contention nor furnished evidence to show that Collins was entitled to purchase allotment C. Haberman would also escape paying some tax on that theory. However, we believe that there are fatal defects in that argument. These petitioners had to comply with the terms of their contracts in order to derive anything of value, over and above their cash salaries, from those contracts. Their rights with respect to allotment B did not entitle them to receive the allotment until January 2, 1928. Their rights were useful and valuable only as a means of purchasing stock. The stock purchase could not be

made final and complete until January 2, 1928. Thus the petitioner's rights under the contracts were not consummate until that date. Until that date the petitioners could have undone all that had been done previously in respect to that allotment by not taking the allotment. The value of the petitioners' rights to purchase allotment B was dependent upon the difference between the fair market value of the stock on the date of delivery of the certificates, January 2, 1928, and the cost of the stock to the petitioners, $35 per share. Prior to January 2, 1928, the market value of the stock on that date would be an unknown factor and consequently the value of the rights would be purely speculative and not a cash equivalent. These rights were unlike stock-purchasing rights, which entitle the holder to make an immediate purchase. The Commissioner did not err in holding that the value of the rights with respect to allotment B on January 2, 1928, was income on that day rather than in 1927, and in holding that the value of the rights with respect to allotment C on January 2, 1929, was income on that day, where the taxpayers were on a cash receipts and disbursements basis.

*Decision will be entered under Rule 50.*