L. DAMON GADD and SARA R. GADD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gadd v. Commissioner
Docket No. 6297-77
United States Tax Court
T.C. Memo 1983-425; 1983 Tax Ct. Memo LEXIS 354; 46 T.C.M. (CCH) 815; T.C.M. (RIA) 83425; July 25, 1983. *354 Held: Petitioners received income from promoters' shares before 1973. They did not receive income, as respondent determined, in 1973 when permanent stock certificates were distributed. Martin D. Cohen, for the petitioners. Arthur H. Boelter, and Alan I. Appel, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income taxes and additions to tax under section 6653(a)[1] (negligence, etc.) against petitioners as follows: Year
Deficiency
Addition to Tax
1973
$42,796.03
$2,139.80
1974 [2]
17,958.46
897.92
The parties have settled most of the 1973 issues and the Court has severed and deferred for possible future trial other issues. The issue for decision is whether the value of 1,237 shares of promoter stock should be included in petitioners' gross income for 1973. [3] *355 FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition in this case was filed, petitioners L. Damon Gadd (hereinafter sometimes referred to as "Gadd") and Sara R. Gadd, husband and wife, resided in Waitsfield, Vermont. From 1963 through 1973, petitioners filed and prepared their Federal tax returns on the cash basis method of accounting. Incorporation of Sugarbush Golf Club, Inc.
From 1958 until some time after 1961, Gadd operated the Sugarbush Ski Resort in the Sugarbush Valley at Warren, Vermont. James S. Herman (hereinafter sometimes referred to as "Herman") owned and operated the Sugarbush Inn which was located in the same Sugarbush Valley area. In 1960, Gadd, Herman, and Harlow Carpenter (hereinafter sometimes *356 referred to as "Carpenter"), another investor in the Sugarbush Valley area, discussed starting a golf course in the Sugarbush Valley area. On September 7, 1960, they signed an agreement and committed funds ($5,000 each) to promote and form such a golf course. Gadd, Herman, and Carpenter are hereinafter sometimes collectively referred to as "the promoters". The Vermont law firm of Meaker and Adams was retained to see to the Vermont law aspects of forming a golf club corporation. On October 5, 1961, the New York Citylaw firm of Satterlee, Warfield, and Stephens was retained to see to the aspects of Federal securities regulation by the Securities and Exchange Commission (hereinafter sometimes referred to as "the SEC") of publicly offering stock in the golf club corporation. David M. Tappen (hereinafter sometimes referred to as "Tappen"), an attorney specializing in such matters, was the Satterlee, Warfield, and Stephens partner who worked on the public offering matter. Tappen gave the promoters an estimate of the cost of registering corporate stock for public sale under Regulation A. [4] At the suggestion of Tappen, the promoters also obtained an estimate of the cost of building *357 a golf course from Robert Trent Jones, the noted golfer and golf course architect. On November 7, 1961, the promoters incorporated Sugarbush Golf Club, Inc. (hereinafter sometimes referred to as "SGC"), under Vermont law with an authorized capital of 15,000 shares of common stock, having a par value of $1 per share; 4,500 of these shares (hereinafter sometimes referred to as "promoters' shares") were set apart for the promoters. Each of the promoters paid $3,050 to SGC for 1,500 shares of common stock. On November 10, 1961, SGC issued three temporary stock certificates, [5] each for 1,500 shares in one promoter's name. The following legend was typed on the back of each of these certificates: The Common Stock represented by this certificate shall not be transferable prior to November 30, 1963 except under certain conditions set forth *358 in an agreement dated November 10, 1961 between the owner hereof and Sugarbush Golf Club, Inc.
At the time of incorporation, the total capital of SGC was the $9,150 paid in by the promoters. This capitalization was enough to cover SGC's organization expenses, but was not enough to meet the purpose of SGC--to construct an 18-hole golf course. Public Offering of SGC Stock
It was estimated that about $300,000 was needed in order to put SGC in working order (i.e., to construct the golf course, acquire related facilities, and provide for operating expenses). The promoters had already paid in $9,150. In order to raise the remaining *359 $290,850 of capital, SGC decided to offer its remaining, unissued 10,500 shares of authorized capital stock for sale to the public under Regulation A (see n. 4, supra). The promoters' shares were excluded from the public offering. SGC planned to sell 250 units of 42 shares each at a unit price of $1,163.40.
Originally, it was contemplated that no subscriber for units under the offering would have to pay for the units unless: (1) at least 178 units were subscribed for and (2) SGC succeeded in obtaining certain land essential for constructing the golf course. The first requirement was changed later to require subscriptions for at least 170 units. By an agreement dated November 10, 1961, [6] *360 *361 the promoters confirmed their understanding relating to their efforts to secure subscriptions for the units of SGC stock. This agreement also provides that, upon the completion of the SGC stock offering, each of the promoters would have the option to buy (at $2.03 per share [7]) as many of the promoters' shares as would be necessary in order to make each of their holdings of the promoters' shares proportional to the number of subscriptions that each of them had secured under the public offering. By another document dated November 10, 1961, Gadd, Herman, and Carpenter agreed to buy 2, 12, and 9 of the 42-share units, respectively, at the public offering price. By November 30, 1962, they bought and paid for 2, 50, and 9 of these units, respectively, at the public offering price. At the times involved herein, Regulation A allowed a corporation to publicly sell its securities having an aggregate offering price of not more than $500,000 without full registration. For purposes of determining whether the $500,000 limit had been reached, Regulation A provided for exclusion of securities issued to a promoter if, by escrow arrangement or otherwise, arrangements had been made to prevent the promoter's securities from being reoffered to the public within one year after the public offering under Regulation A begins. Gadd *362 was a "promoter" (as were Herman and Carpenter), as that term is defined under Regulation A.
In order to exclude the promoters' shares from the Regulation A limit, the promoters, SGC, and Montpelier National Bank (hereinafter sometimes referred to as "the Bank") complied with Regulation A by entering into an escrow agreement dated November 29, 1961 (hereinafter sometimes referred to as "the escrow agreement"). [8] *363 *364 *365 *366 *367 *368 The escrow agreement instructs the Bank to hold the promoters' shares until the date 13 months from the date of the definitive offering circular of the SGC public stock offering. Thereafter, the Bank was to deliver the promoters' shares to the promoters upon receipt of written advice by SGC and the promoters that certain events had occurred. The escrow agreement was signed by each of the promoters, by Herman as president of SGC, and by George H. Amidon for the Bank. The Exhibit 1 referred to in paragraph 2 of the escrow agreement is a copy of the November 10, 1961, written agreement by the promoters to solicit subscriptions for units of SGC stock, set forth in relevant part at n. 6, supra.
During November and December 1961, SGC filed with the SEC various forms and documents, including a proposed form of a Regulation A offering circular. SGC also filed the forms and documents required for registration of securities under the Vermont Securities Act. The SEC approved the proposed SGC Regulation A offering. On December 11, 1961, the SEC notified SGC that the proposed public offering may begin on or after December 12, 1961. The SEC also advised SGC that a revised offering circular must be filed if the offering was not completed within nine months. A printed Regulation A offering circular, dated December 12, 1961, was issued by SGC and used by the promoters *369 in selling units of SGC stock to the public. During 1961 and 1962, in performance of the November 10, 1961, agreement with Herman and Carpenter (n. 6, supra ), Gadd approached friends and business acquaintances to secure SGC stock subscriptions. Gadd kept a record of the stock subscriptions he obtained by keeping a copy of each signed subscription agreement. Both Herman and Carpenter kept records in the same way. In a letter dated August 13, 1962, the SEC notified SGC that a revised Regulation A offering circular must be filed if SGC stock was going to continue to be sold after September 12, 1962. SGC filed additional information requested by the SEC, including a proposed revised Regulation A offering circular. In a lette dated November 29, 1962, the SEC notified SGC that the offering could resume on or after November 30, 1962. SGC issued a revised Regulation A offering circular dated November 30, 1962. This offering circular was "the definitive Offering Circular" within the meaning of paragraph 4 of the escrow agreement (see n. 8, supra). Both the offering circular dated December 12, 1961, and the offering circular dated November 30, 1962, state that each of the three promoters, *370 Gadd, Herman, and Carpenter, had acquired 1,500 shares and that these shares were subject to restrictive agreements "whereby they [the promoters] may not dispose of any of such shares prior to November 30, 1963, except to each other, without the prior written consent of [SGC]." Neither offering circular mentions the escrow agreement. In a letter dated August 19, 1963, the SEC notified SGC that a revised Regulation A offering circular must be filed if SGC stock was going to continue to be sold after August 30, 1963. Tappen notified the SEC by a letter dated September 13, 1963, that the offering was terminated on August 30, 1963. On October 25, 1963, SGC sent a revised report Form 2-A, as required by SEC rules, confirming that the offering was terminated on August 30, 1963, and asserting that it had been terminated because of an inability to sell the remaining shares of common stock. Any attempt to sell units of SGC stock after August 30, 1963, would have been a violation of the Securities Act of 1933. The promoters had completed their services under the promoters agreement by August 30, 1963. Distribution of the Promoters' Shares
Under the terms of the escrow agreement, the Bank *371 was to hold the promoters' shares until the date 13 months from the date of the definitive offering circular (n. 8, par. 4, supra). This thirteen-month period ended in December 1963. Each of the promoters had retained records enabling him to determine, at any time on or after August 30, 1963, how many units he had succeeded in selling under the offering. The escrow agreement did not include any provision as to who would be entitled to vote the promoters' shares while they were held in escrow or who would receive a dividend paid on these shares while they were held in escrow. Under Vermont law, if SGC had paid a dividend on the promoters' shares while the shares were held in escrow, the promoters would have been entitled to receive these dividends. Also, under Vermont law, the promoters were entitled to vote the promoters's shares while the shares were held in escrow. At the shareholders' meetings held by SGC between 1961 and October 1973, which Gadd either attended in person or gave a proxy for, Gadd voted the 1,500 shares of promoters' shares issued in his name as well as the 84 shares that he purchased during the Regulation A offering.
The minutes of the August 11, 1971, annual *372 shareholders' meeting of SGC state that "[i]t was informally decided that the clerk [Charles J. Adams (hereinafter sometimes referred to as "Adams")] should attend to the issuance of promoter's stock according to the application thereof by the three promoters." After the meeting, Gadd told Adams that he was going to ask the Bank to send the escrowed stock certificates to Adams. Shortly thereafter, Gadd informally asked the Bank to send the escrowed stock certificates to Adams. The Bank is a small institution in a small town; its personnel are informal in dealing with customers. On August 26, 1971, Adams received from the Bank (1) an executed copy of the escrow agreement; (2) the three temporary stock certificates representing the 4,500 promoters' shares; and (3) a transmittal memorandum on the Bank's letterhead which indicated that the certificates were sent at the request of Gadd. After Adams received the certificates, he tried at various times to get the promoters together for the purpose of distributing the shares and issuing new stock certificates. He did not succeed in doing so until sometime in 1973. The promoters did not meet for the purpose of distributing the promoters' *373 shares until 1973, partially because they were long-standing friends who trusted one another and did not see an urgency of meeting sooner, and partially because of the increasing periods of time during which Gadd and Herman were out of the United States. When the promoters met with Adams in 1973, they easily determined how many shares each had been responsible for selling under the Regulation A offering. Thereafter, Warren Ketcham (hereinafter sometimes referred to as "Ketcham"), the then president of SGC, prepared a simple, one-page computation dated September 21, 1973, showing (1) the number of shares each of the promoters had sold under the Regulation A offering; (2) the percentage these shares represented of the total shares sold by the promoters under the Regulation A offering; (3) the number of promoters' shares each of the promoters was entitled to (computed by multiplying the total number of promoters' shares, 4,500, by each promoter's respective percentage); and (4) the number of shares each promoter was required to offer to another promoter under the promoters' agreement (see n. 6, supra). Ketcham's computation showed that Gadd was required to offer 263 shares to Herman *374 at $2.03 per share, for a total of $533.29. Sometime in 1973, after the promoters had met, Herman paid Gadd for the 263 shares. Before 1973, Gadd did not ask Adams for the promoters' shares certificates received from the Bank in 1971. After Ketcham made the computations, Adams become concerned that a distribution of the shares might create an SEC problem. In a letter dated July 30, 1973, Adams asked Tappen whether any SEC action needed to be taken before the shares could be distributed. In response to Adams' letter, Tappen drafted a letter addressed to the Bank dated August 28, 1973, stating that the Bank was authorized and requested to deliver the promoters' shares it held in escrow to SGC. In a letter dated August 1, 1973, Tappen told Adams to send the original of this letter to the Bank and a copy to the SEC Boston Regional Office. Adams did not send the original of the August 28, 1973, letter to the Bank because the stock certificates had already been sent to him from the Bank. A copy of the August 28, 1973, letter was signed by Ketcham, as president of SGC, and by Herman, Carpenter, and Gadd, as the promoters, and was sent to the SEC Boston Regional Office. Sometime after *375 this, Adams cancelled the three temporary stock certificates and stapled them in the SGC stock certificate book. On or about October 16, 1973, SGC issued new, permanent certificates to the promoters as indicated in table 1.
Table 1 Promoter
Certificate No.
Number of Shares
Gadd
N64
1,237
Herman
N63
2,250
Carpenter
N65
1,013
On each of the three stock certificate book stubs relating to these permanent certificates, the handwritten words, "Promotors [sic] stock" appear under the printed line which reads "From whom Transferred". Gadd received his shares of SGC promoters' shares before 1973. Gadd did not report receipt of any of these shares as giving rise to income for 1963, 1971, or 1973. OPINION Petitioners contend that they did not realize compensation income in 1973, on the receipt of a stock certificate for 1,237 shares of SGC, for three alternative reasons. Firstly, petitioners argue that if Gadd received compensation in the form of stock at all, it was received in 1961. On November 10, 1961, petitioners assert, Gadd actually received 1,500 shares of SGC when he paid $3,050 for them and received certificates evidencing ownership. The events in 1973, petitioners contend, constitute a sale *376 of 263 shares of the 1,500 shares Gadd owned since 1961 and do not constitute the receipt of 1,237 shares. Secondly, petitioners argue that Gadd constructively received 1,237 shares of SGC in 1963. The doctrine of constructive receipt, petitioners assert, can be used as a defense by taxpayers; the doctrine turns on the right, rather than the power, to receive income. Gadd's right to receive the 1,237 shares became fixed in 1963, petitioners state, when "all events had occurred and all facts were known to the promoters which would have enabled them to secure release of the escrowed certificates". Thirdly, if Gadd could not constructively receive the shares as long as they were held in escrow, then petitioners argue that he constructively received them when the escrow agent released the shares to Adams in 1971.
Respondent contends that petitioners realized compensation income in 1973. Respondent asserts that the general rule for taxpayers who report income on the cash basis method of accounting, as petitioners do, is that income is reported in the year it is received. Respondent further asserts that Gadd received 1,237 shares of SGC in 1973 when the number of shares each promoter *377 was entitled to was computed and a new certificate evidencing this amount was issued to him. Respondent offers two responses to petitioners' alternative arguments that Gadd constructively received 1,237 shares either in 1963 or 1971. Firstly, respondent asserts that petitioners should not be allowed to use the doctrine of constructive receipt to escape tax on the item entirely. [9] Secondly, if this Court does permit petitioners to use the doctrine, then respondent contends that Gadd did not constructively receive the shares before 1973 because until then the shares were subject to a substantial limitation or restriction. [10] *378 We agree with petitioners that Gadd did not receive compensation income in 1973, on the receipt of a stock certificate for 1,237 shares of SGC.
Gross income includes compensation for services. Section 61(a)(1). [11] Generally, if a corporation transfers its stock to a person as compensation for services, then the fair market value of the stock at the time of transfer constitutes gross income to that person. Section 1.61-2(d)(4), Income Tax Regs.
There is no real dispute that the promoters' shares constitute compensation income to Gadd for his promotional services. The dispute is as to when *379 petitioners must report this income, and in what amount (see n. 3, supra). Petitioners reported their income on the cash receipts and disbursements method of accounting during the period 1963 through 1973. A cash basis taxpayer must report gross income for the year in which received. Section 451(a). [12] Usually, a cash basis taxpayer must report gross income, and is taxable on it, for the year in which it is actually received; however, if gross income is constructively received before it is actually received, then the income is taxable for the earlier year of constructive receipt. Hornung v. Commissioner,47 T.C. 428, 433-434 (1967); Cohen v. Commissioner,39 T.C. 1055, 1062-1064 (1963); Johnson v. Commissioner,25 T.C. 499, 502 (1955); sections 1.446-1(c)(1)(i)[13] *380 and 1.451-2 (a), [14] *381 Income Tax Regs.
The doctrine of constructive receipt is a rule of law which can be used by a taxpayer to meet his burden of proving that he did not receive income in the year for which respondent determined a deficiency. [15]Ross v. Commissioner,169 F.2d 483, 491-492 (CA1 1948), revg. a Memorandum Opinion of this Court; [16]Cohen v. Commissioner,39 T.C. at 1063-1064. See Blyler v. Commissioner,67 T.C. 878, 884-885 (1977); Hornung v. Commissioner,supra.Compare Foster v. Commissioner,80 T.C. 34, 191-195 (1983), where we held that a petitioner is not entitled to invoke section 482. Respondent urges that even if we were to "find as a fact that the stock *382 was constructively received in a prior year [i.e., before 1973] petitioners should not be permitted to utilize the doctrine of constructive receipt to escape tax on this item entirely." To begin with, it is not clear that if petitioners are allowed to use the constructive receipt doctrine that they would escape tax entirely. Respondent, at trial, indicated the possible availability of the mitigation provisions of sections 1311 through 1314. (See n. 9, supra.) Further, we have held that a taxpayer may invoke the constructive receipt doctrine "to defeat an attempt by the Commissioner to assess a tax in a later year, even though he has not reported the amounts as income in the earlier year." Cohen v. Commissioner,39 T.C. at 1063; see also, Hornung v. Commissioner,47 T.C. at 441. We conclude that petitioners, in the instant case, may use the constructive receipt doctrine. In incorporating the doctrine of constructive receipt, respondent's regulations have established a two-pronged test. The first prong is whether the income was set apart for the taxpayer. In the instant case, the promoters' shares were set apart for Gadd, Herman, and Carpenter. Temporary certificates for the promoters' *383 shares were issued and this stock was separated from and not included in the public offering of SEC stock under Regulation A. The second prong is whether the taxpayer's control over the income is not substantially limited or restricted. Control over stock is usually manifested by possessing the certificates, voting the stock, receiving dividends paid on the stock, and being able to transfer the stock. Whether this control is substantially limited or restricted is essentially a factual question. Ross v. Commissioner,169 F.2d at 491. On the one hand, Gadd's control over the promoters' shares was limited or restricted in the following ways: 1. Gadd did not possess the stock certificates while they were held in escrow or by Adams. 2. There were restrictions on Gadd's right to transfer the shares until, at the latest, 1971. 3. Because of the promoters' agreement of November 10, 1961 (see n. 6, supra), there was some uncertainty as to how many shares Gadd would eventually own. On the other hand, Gadd had substantial control over the promoters' shares, as evidenced by the following: 1. Gadd voted the 1,500 shares from 1961 on.
2.Gadd would have been entitled to dividends if any *384 had been declared. 3. The promoters agreed that Gadd owned 1,500 shares (see n. 6, supra). 4. The temporary certificate was issued in Gadd's name. 5. The shares could have been released from escrow as early as December 1963 and, in fact, were released on August 26, 1971. 6. By 1962 or 1963, Gadd had performed all the services for which the shares had been issued. 7. By August 30, 1963, when the sale of shares under Regulation A was no longer allowed, all the facts had occurred that were necessary to compute the number of promoters' shares that Gadd would eventually own. The calculations could have been made at any time thereafter. (The record does not include any information suggesting that there was a dispute that affected this computation or the timing thereof. The remaining actions were essentially ministerial.) In determining whether Gadd's control was substantially limited or restricted, we have balanced the above-listed factors and conclude that his control was not substantially limited or restricted. We further conclude that Gadd constructively received his promoters' shares [17] before 1973. Under these circumstances, the promoters' shares do not constitute income *385 to petitioners for 1973. Since 1973 is the only year before the Court and petitioners' deficiency for 1973 would not be affected by any conclusion we might reach as to what pre-1973 year the promoters' shares became taxable, it is not necessary for us to examine petitioners' alternative contentions that the shares gave rise to income reportable by them for 1971, or 1963, or 1961. Foster v. Commissioner, 80 T.C. at 236-237; LTV Corp. v. Commissioner,64 T.C. 589 (1975); Hornung v. Commissioner,47 T.C. at 433, 441. See n. 9, supra. Respondent agrees that income is not constructively received if it is subject to substantial restrictions or limitations. He argues that, in the instant case, there were substantial restrictions or limitations which prevented Gadd from constructively receiving the shares until 1973. As discussed *386 infra, we do not find support in the record for concluding that the restrictions or limitations respondent alleges actually existed, much less that they represented substantial restrictions or limitations. The first restriction respondent argues existed was a type of forfeiture. Respondent states that Gadd would have had to surrender his right to transfer the shares and his right to any shares in excess of 1,500 which might be due to him under the promoters' agreement, in order to get control of the shares before 1973. The record does not support respondent's contentions as to whether Gadd would have had to surrender his rights to any shares in excess of 1,500. Gadd paid for and owned the 1,500 shares from the start, subject to Herman's and Carpenter's potential options. The matter of the options could have been resolved at any time after August 30, 1963. The record does not suggest a dispute about the options; rather, it suggests that the promoters would have resolved the matter amicably and promptly at the instance of any one of them. We do not see any valuable right that Gadd would have had to give up in order to receive income on account of the promoters' shares.
If respondent's *387 contention as to transferability refers to requirements imposed by the SEC under Regulation A or the escrow agreement, then the record does not support respondent's position.By the end of 1963, transferability restrictions of the SEC and the escrow agreement could have been satisfied by simple notifications or requests. Gadd's rights were perfectible in 1963 or 1971 or any time he chose to initiate the steps toward perfecting them. There was no right to transfer that Gadd had to give up in order to receive his promoters' shares. Respondent further contends that "there could be no constructive receipt while ownership of the stock was open to question." We agree with this proposition. However, as indicted supra, the record convinces us that the promoters had no dispute as to how many shares each of them was entitled to, and no such dispute was resolved in 1973. The promoters merely failed to complete the necessary ministerial steps until 1973. Respondent cites McRitchie v. Commissioner,27 T.C. 65 (1956), and two Memorandum Opinions [18] for his contention. In McRitchie, there was litigation as to ownership of stock, with the issuing corporation paying dividends on that stock into *388 the registry of the court until the litigation was terminated. The Memorandum Opinions also involved actual litigation as to ownership (Ruble) or lengthy dispute ended only by threat of litigation as to ownership (Estate of Sutton). The record in the instant case demonstrates a lack of dispute. McRitchie and the two Memorandum Opinions are distinguishable. For the proposition that "there could be no constructive receipt until the amount to be received could be computed" respondent cites Haberman v. Commissioner,31 B.T.A. 75 (1934), affd. 79 F.2d 995 (CA2 1935), Erskine v. Commissioner,26 B.T.A. 147 (1932), and Sanchez v. Commissioner,6 T.C. 1141 (1946), affd. 162 F.2d 58 (CA2 1947). In Haberman, the taxpayer was entitled to receive 1,200 shares of his corporate employer's stock on January 2, 1927, and like amounts on January 2, 1928, and January 2, 1929. We held that the taxpayer received incoe on each January 2 in the amount by which the fair market value of the stock on that date exceeded the amount he paid for the stock. Since he could not receive the stock until *389 January 2 and could not determine the income until the events of that date had occurred, there was no basis for concluding that he had constructively received the income at an earlier date. In the instant case, Gadd could have determined in 1963 the number of promoters' shares to which he was entitled, and could have received the shares upon request well before 1973. In Erskine, the taxpayer was given, by a 1922 contract with his corporate employer, the right to purchase certain amounts of his employer's stock, depending on the year-to-year profitability of his employer. We held that the taxpayer was taxable in each year that he bought the stock (1923, 1924, 1925, and 1926), and not in 1922. We noted that the facts (employer's profitability and employee's services) which determined the number of shares the taxpayer could buy under the contract each year were not knowable until the year of purchase. (26 B.T.A. at 162.) In the instant case, the promoters had completed their services and Gadd could have determined in 1963 the number of promoters' shares to which he was entitled. In Sanchez, a corporation agreed to pay the taxpayer royalties based on sales of a product produced by *390 use of the taxpayer's invention. The royalties for the last quarter of 1939 were paid by a check issued on January 3, 1940. We held that the taxpayer did not receive income in 1939, but rather received it in 1940. We found that the amount of the royalties could not be computed before the close of business on December 31, 1939, and that there was no evidence that the payor had credited the royalties on its books to the taxpayer in 1939.We further noted that Sanchez was not a situation where the failure to receive the amounts was due to deliberate refusal to take the amounts. In the instant case, the promoters' shares were set aside in 1961, and Gadd could have determined in 1963 the number of promoters' shares to which he was entitled. We agree with Haberman,Erskine, and Sanchez, but all of these cases are distinguishable. We hold for petitioners on the one issue presented.In order to take account of the parties' disposition of the other issues in the instant case, Decision will be entered under Rule 155.
Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the year in issue. ↩
2. Petitioners did not assign any error as to 1974; we have no jurisdiction over the deficiency or addition to tax for this year. O'Neil v. Commissioner,66 T.C. 105↩ (1976).
3. The Court granted the parties' joint motion to sever and defer for possible future trial the issues of the valuation of 1,237 shares of promoters' stock and the appropriateness of the addition to tax under section 6653(a) for 1973. Since we conclude, infra,↩ that the promoters' stock was received before 1973, in accordance with the parties' understanding, both of these severed issues become moot.
4. Regulation A, a regulation issued by the SEC, provides a general exemption from registration under the Securities Act of 1933 for certain publicly sold stock. Regulation A appears in Rules 251 through 263 of the general rules under the Securities Act of 1933. 17 C.F.R. secs. 230.251-230.263 (1980)↩ (in effect for all years relevant to the instant case).
5. The following legend was typed on the front of each of these certificates, below the name of the corporation and class of stock, and above the name of the shareholder: Temporary Certificate Exchangeable for Definite Certificate when Available for Delivery As of November 10, 1961, SGC did not have printed, permanent stock certificates. At that time, printed, permanent stock certificates were considered unnecessary because it was uncertain whether SGC would actually engage in the business of constructing a golf course or would collapse for lack of adequate capital.↩
6. The agreement provides, in relevant part, as follows: Sugarbush Golf Club, Inc. (the "Company") was incorporated under the laws of the State of Vermont with an authorized capitalization consisting of 15,000 shares of Common Stock ($1 par value) of which 4,500 shares (the "Promoters' Shares") have been issued and are outstanding and are owned, 1,500 shares each, by the three of us. Each of us will use his best efforts to solicit, prior to the completion of the Offering, subscriptions for the Units at the public offering price therefor, said subscriptions to be evidenced by an executed Subscription Agreement in the form annexed hereto as Exhibit "A", delibered to the office of the Company in Warren, Vermont, prior to the completion of the Offering. Upon Completion of the Offering, each of us shall have an option to purchase from, and shall be required to sell to, the others at a price of $2.03 per share, such number of Promoters' Shares as shall be required to result in a distribution of the 4,500 Promoters' Shares between the three of us as nearly as possible in proportion to the number of subscriptions obtained by each of us (which may include subscriptions by us); provided, however, that none of us will be obligated to sell any such shares if he has obtained subscriptions to at least 79 Units. 7. The option price, $2.03 per share, is one-third of a cent per share less than the original price paid by the promoters to SGC for their promoters' shares. During the public offering the public offering price for the 42-share units was $27.70 per share.↩
8. The escrow agreement provides as follows: ESCROW AGREEMENT
THIS ESCROW AGREEMENT, dated the 29th day of November, 1961, between SUGARBUSH GOLF CLUB, INC., a Vermont corporation (hereinafter called the "Company"), JAMES S. HERMAN, of Warren, Vermont, HARLOW CARPENTER, a Waitsfield, Vermont, and L. DAMON GADD, of Fayston, Vermont (hereinafter collectively called the "Stockholders"), and MONTPELIER NATIONAL BANK, a national banking association (hereinafter called the "Escrow Agent"); WITNESSETH:
WHEREAS, in order to comply with the provisions of Rule 253(c) of the General Rules and Regulations (hereinafter called the "General Rules and Regulations") under the Securities Act of 1933, as amended, the Stockholders, simultaneously with the execution of this agreement, are depositing with the Escrow Agent 4,500 shares in the aggregate of the Common Stock (hereinafter called the "Stock") of the Company issued in the following names: Number of
Name
Certificate No.
Shares
James S. Herman
1
1,500
Harlow Carpenter
2
1,500
L. Damon Gadd
3
1,500
the deposit of which is hereby acknowledged by the Escrow Agent; NOW, THEREFORE, the parties hereto agree as follows: 1. The Escrow Agent hereby accepts the Stock in escrow and agrees to hold and keep the Stock in accordance with the terms and conditions hereof and for the uses and purposes herein set forth and to deliver the Stock upon the terms and conditions hereinafter set forth. 2. The Stockholders represent that annexed hereto as Exhibit 1 is a true and correct copy of an agreement (hereinafter called the "Stockholders Agreement") between the Stockholders, dated November 10, 1961, pursuant to which the Stockholders agree to make certain transfers of the Stock between themselves upon the happening of certain conditions set forth therein. The Escrow Agent shall not be held to take notice of any terms of any agreement or any rights stated with respect to the Stock except as set forth in Exhibit 1 and herein. 3. During the period of holding the Stock is escrow, no transfer or other disposition of any of the Stock or any interest therein is to be made whether subject to this agreement or otherwise, except as provided in the Stockholders Agreement, and, except as so provided, all of the Stock is to be held intact as issued and placed in escrow hereunder. Any Stock transferred pursuant to the provisions of the Stockholders Agreement shall remain in escrow and subject to all the terms and provisions hereof. 4. The Escrow Agent is hereby authorized and instructed to hold the Stock in escrow pursuant to Rule 253(c) of the General Rules and Regulations, until such date as shall be thirteen months from the date, shown on the definitive Offering Circular, of an offering of shares of stock of the Company in accordance with the provisions of the General Rules and Regulations. Thereafter upon receipt of written advice by the Company and the Stockholders to the Escrow Agent (and to the Securities and Exchange Commission) that (i) none of the Stock or any interest therein has been transferred or otherwise disposed of, except in accordance with the Stockholders Agreement, and that (ii) the Stock is (a) registered under the Securities Act of 1933, as amended, or (b) covered by a ruling pursuant to the provisions of Regulation A under the General Rules and Regulations under the Securities Act of 1933, as amended, or (c) is otherwise exempt from registration or is not then required to be registered, and that (iii) a copy of such advice has been delivered to the Securities and Exchange Commission, the Stock will be delivered to the Stockholders by the Escrow Agent. If a registration statement is not then in effect and if an appropriate filing under Regulation A has not been completed under said Act with respect to the Stock prior to delivery of the Stock to the Stockholders by the Escrow Agent, (A) the Company and the Stockholders will advise the Escrow Agent that the Company, as its own transfer agent for the Stock, will not make any transfer of the Stock unless a registration statement under the Securities Act of 1933, as amended, with respect to the Stock is in effect or an exemption from the registration requirements of the Stock is in fact applicable to the Stock, and (B) the Company will impress upon the face of the certificate or certificates representing the Stock and upon all certificates issued in exchange therefor the following legend: "No sale, offer to sell or transfer of the shares represented by this certificate shall be made unless a registration statement under the Federal Securities Act of 1933, as amended, with respect to such shares is then in effect or an exemption from the registration requirements of such Act is then in fact applicable to such shares." 5. This agreement shall not be amended, revoked, rescinded or modified in any respect without the prior approval of the Securities and Exchange Commission. 6. The fee of the Escrow Agent for its services hereunder shall be $100.00, payable at the time of the execution of this agreement and to be borne equally by the Stockholders. 7. In performing any of its duties hereunder, the Escrow Agent shall not incur any liability to anyone for any damages, losses or expenses except for wilful default or negligence, and it shall accordingly not incur any such liability with respect (i) to any action taken or omitted in good faith upon advice of its counsel or counsel for the Company given with respect to any questions relating to the duties and responsibilities of the Escrow Agent under this agreement, or (ii) to any action taken or omitted in reliance upon any instrument, including the written advices provided for herein, not only as to its due execution and the validity and effectiveness of its provisions but also as to the truth and accuracy of any information contained therein, which the Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by a proper person or persons and to conform with the provisions of this agreement. 8. The Company and the Stockholders, jointly and severally, hereby agree to indemnify and hold harmless the Escrow Agent against any and all losses, claims, damages, liabilities and expenses, including reasonable costs of investigation and counsel fees and disbursements, which may be imposed upon the Escrow Agent or incurred by the Escrow Agent in connection with its acceptance or appointment as escrow agent hereunder, or the performance of its duties hereunder, including any litigation arising from this agreement or involving the subject matter hereof or the shares deposited hereunder.
9. At trial, respondent stated that if we find that Gadd constructively received the stock in 1971, then tax due on the gross income realized from the stock in 1971 may be assessable under the mitigation provisions of sections 1311 through 1314. Respondent conceded that the correct procedure for raising this issue is through the issuance of a notice of deficiency for the year of constructive receipt; this is not a matter for us to determine in the instant case. ↩
10. The parties do not discuss section 83, relating to property transferred in connection with performance of services. Section 83(i)(1) provides that section 83 "shall not apply to property transferred * * * pursuant to a binding written contract entered into before April 22, 1969". Presumably, the parties agree that the relevant transfer occurred pursuant to a binding written contract entered into in 1961.
11. SEC. 61. GROSS INCOME DEFINED. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items;↩
12. SEC. 451. GENERAL RULE FOR TAXABLE YEAR OF INCLUSION. (a) General Rule.--The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period. ↩
13. Section 1.446-1 General rule for methods of accounting. (c) Permissible methods--(1) In general. Subject to the provisions of paragraphs (a) and (b) of this section, a taxpayer may compute his taxable income under any of the following methods of accounting: (i) Cash receipts and disbursements method. Generally, under the cash receipts and disbursements method in the computation of taxable income, all items which constitute gross income (whether in the form of cash, property, or services) are to be included for the taxable year in which actually or constructively received. Expenditures are to be deducted for the taxable year in which actually made. For rules relating to constructive receipt, see § 1.451-2↩. For treatment of an expenditure attributable to more than one taxable year, see section 461(a) and paragraph (a)(1) of § 1.461-1. 14. Section 1.451-2 Constructive receipt of income. (a) General rule. Income although not reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *
15. The test to be applied is the same, regardless of which side takes which position; however, the outcome of a given case may well be affected by who has the burden of proof, including the burden of persuasion. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.↩
16. Memorandum Opinion dated February 10, 1947.↩
17. Since we conclude that petitioners constructively received income before the year in issue, we do not decide whether Gadd was entitled to 1,237 or 1,500 shares before 1973. The exact number may be important in determining the amount of the earlier year's income, but, as we have stated, this is not a matter for us to determine in the instant case (see n. 9, supra↩).
18. Estate of Sutton v. Commissioner, entered March 21, 1946, and Ruble v. Commissioner,↩ entered January 14, 1943.